Harry BARACK, Appellant,

v.

UNITED STATES of America, Appellee.

No. 18213.

United States Court of Appeals Ninth Circuit.

May 14, 1963.

Black, Kendall, Tremaine, Boothe & Higgins, and Ronald K. Ragen, Portland, Or., for appellant.

Sidney I. Lezak, U. S. Atty., and William B. Borgeson, Asst. U. S. Atty., Portland, Or., for appellee

Before CHAMBERS, HAMLEY and MERRILL, Circuit Judges.

HAMLEY, Circuit Judge.

Harry Barack was convicted and sentenced for having caused to be transported in interstate commerce, with unlawful and fraudulent intent, securities which he knew to be falsely made and forged, in violation of 18 U.S.C. § 2314. The "securities" in question were Hilton Carte Blanche charge vouchers, which Barack

signed as the purported holder of a Hilton Carte Blanche credit card.[1]

Barack appeals raising, as the sole issue, whether such charge vouchers are "securities" within the meaning of section 2314.

Section 2314 is a part of the National Stolen Property Act, as amended, 18 U.S.C. §§ 2311–2317, some of the terms of which are defined in 18 U.S.C. § 2311. The term "securities," as there defined,[2] does not expressly include a "charge voucher," as the instruments here in question are denominated. Nor does it expressly include a "sales invoice," "credit sales slip," "charge slip," or "purchase slip." Section 2311, however, does expressly include "any * * * evidence of indebtedness * * *" in its definition of the broader term "securities."

It was the Government's theory in prosecuting Barack that, under the circumstances of this case, each of the charge vouchers which Barack signed became an "evidence of indebtedness" within the meaning of section 2311, and that therefore all of them were "securities" within the meaning of section 2314. Barack opposed this contention at the trial but the court accepted the Government's view and so instructed the jury. On this appeal the parties renew this issue, both conceding that the judgment must stand or fall depending on how the question is resolved.

The facts which the parties believe should be considered in disposing of the appeal are brought to us in an agreed statement, and are not in dispute. The Hilton Credit Corporation (Hilton) maintains its headquarters in California but issues credit cards to persons living in all parts of the world. The credit cards are issued under a tripartite arrangement which includes Hilton, the credit card holders, known as "members," and vendors of merchandise and services, known as "associates."

Hilton issues credit cards to members upon the request of the latter. When a card is sent to a member for his use, there is also transmitted to him a "stuffer" setting forth the agreement between Hilton and the cardholder, and the corporation's regulations prescribed pursuant to the agreement. Also transmitted is a directory of associates for the section of the country in which the member lives. This directory includes the same agreement and regulations referred to above.[3]

Hilton contracts separately with each associate and provides each with a supply of printed charge voucher forms. These forms are designed for issuance in triplicate, on each of which the words "Hil-

---

1. Barack was convicted on six counts of an eight-count indictment, each of which charged a different transaction involving such a charge voucher and credit card.

2. Section 2311. " 'Securities' includes any note, stock certificate, bond, debenture, check, draft, warrant, traveler's check, letter of credit, warehouse receipt, negotiable bill of lading, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate; certificate of interest in property, tangible or intangible; instrument or document or writing evidencing ownership of goods, wares, and merchandise, or transferring or assigning any right, title, or interest in or to goods, wares, and merchandise; or, in general, any instrument commonly known as a 'security', or any certificate of interest or participa-

tion in, temporary or interim certificate for, receipt for, warrant, or right to subscribe to or purchase any of the foregoing, or any forged, counterfeited, or spurious representation of any of the foregoing; * * *."

3. Neither a "stuffer" nor a directory is in the record on appeal but the agreed statement contains these excerpts from the agreement and regulations contained in those documents:

"Holding or use of the CARTE BLANCHE card shall constitute an agreement between the card holder and Hilton Credit Corporation as follows:

* * * * *

"3. Each time a card is presented for services or goods, the card holder must sign a CARTE BLANCHE charge voucher. Failure to sign for charges will not, however, relieve the card holder from liability for charges incurred with use of card."

ton Carte Blanche" are printed. Space is provided on the voucher forms for the name of the vendor, the signature of the credit card holder, and information to be transferred to the voucher from a Hilton credit card by means of a stamping machine. This information consists of the name and address of the holder, the number assigned to the card and its expiration date. Each voucher carries the notation: "Address correspondence regarding this charge to above," the reference being to the seller of the merchandise or service. There is also space on the charge voucher to indicate the nature of the merchandise or service and its price.[4]

In the contract between Hilton and each associate, the corporation agrees to purchase from the associate all accounts in connection with which a Hilton charge voucher is issued on the strength of a Hilton credit card. The agreed purchase price of such accounts is the gross amount of each account less a specified percentage discount. This contract was not brought up in the appellate record. The agreed facts do not disclose whether these accounts are purchased with or without recourse. Accordingly, we do not know whether Hilton or the seller stands the loss if a credit cardholder fails to pay because he is a poor credit risk, because his name was forged on a credit voucher, or because the merchandise was defective, or had not been delivered.

Early in August, 1961, Barack obtained Hilton credit card No. 943-434-542-5, issued by Hilton to B. London of Toronto, Ontario, Canada. Barack knew that any use by him of this card was not authorized by Mr. London. At Portland, Oregon, between August 5 and 9, 1961, Barack made use of this card in purchasing food, drink, lodging, clothing, and camera supplies from Hilton associates.

In connection with each purchase Barack presented the B. London credit card, representing himself to be that person. Each associate filled in the appropriate blanks on the original charge voucher and, by means of carbon interlays, the same spaces were filled on the other two copies. By means of a stamping machine the triplicate vouchers were impressed with information contained on the B. London credit card and Barack signed the original voucher. The original and two copies were torn apart, and one carbon copy was given to Barack who left with the purchase.

Shortly, thereafter, the original voucher was forwarded to Hilton, in California, by the particular associate who had made the sale. Hilton paid the associate pursuant to the contract between them, and billed B. London for the gross amount of the account.

---

4. Each charge voucher also carries this or a similar printed notation:
"This charge voucher will be transmitted to Hilton Credit Corporation through regular banking channels or the United States mails and will thereafter be billed direct by that office; remit only to Hilton Credit Corporation, 8544 Sunset Boulevard, Los Angeles, California."
In addition, two of the charge vouchers here in issue include, immediately above the place designated for the cardholder's signature, the following notation:
"I have examined this charge and find it to be correct; I confirm that the terms of sale are as stated in the applicable provisions of the 'Regulations and Agreement' appearing in the Carte Blanche Directory, which I have read and to which I agree."

The two vouchers (Government exhibits 3 and 5) which contained the latter notation were made the subjects of counts 4 and 6 of the indictment respectively. As to these counts, as well as counts 5 and 8, the imposition of sentence was suspended and the defendant was placed on probation for a period of three years, the periods of probation to run concurrently with each other and consecutively with the sentences imposed on counts 2 and 3. A sentence of one year was imposed on count 2, and a like sentence was imposed on count 3, the two sentences to run consecutively, a total period of two years imprisonment being provided for. It was also provided that the sentence imposed on count 2 would run concurrently "with the State of Oregon sentence against the defendant * * *"

This court has held that circumstances may exist under which a charge invoice issued in connection with a credit purchase made after presentation of a credit card may be an "evidence of indebtedness" within the meaning of section 2311. Thus, in a collateral attack on the judgment and sentence, made under 28 U.S.C. § 2255, a prisoner who has pleaded guilty to a charge under section 2314 based on such a transaction may not prevail. See Ingling v. United States, 9 Cir., 303 F.2d 302, involving a Phillips Petroleum Company charge voucher.[5]

The same result was reached in Lewis v. United States, 10 Cir., 301 F.2d 787. Judge Murrah, speaking for the court, there pointed out the limited question which is presented where a collateral attack is made on the judgment after a plea of guilty.[6] Two district courts have come to the same conclusion under like circumstances.[7]

But here we are called upon to decide, not on the pleadings (with or without a plea of guilty) but on the facts established by evidence produced at a trial, whether the Hilton Carte Blanche charge voucher issued in connection with each of the described transactions was an "evidence of indebtedness." There can be no such presumption, conclusive or otherwise, where a voucher is made the subject of a charge to which a defendant pleads not guilty, and on which he is brought to trial. Then the presence or absence of circumstances which make it proper to regard a voucher as an "evidence of indebtedness" can be determined from the record.

No appellate court has heretofore been called upon to deal with the question in such a context. Two district courts have done so, and both have held that, under the facts there presented the charge invoice in question was not an "evidence of indebtedness" within the meaning of section 2311.[8]

Four of the charge vouchers which led to convictions on individual counts do not appear to meet any of the criteria which, we suggested in Ingling, might render a charge voucher an "evidence of indebtedness," and consequently a security. See note 5, above. The remaining two, however, which as Government exhibits 3 and 5 were made the subjects of counts 4 and 6 of the indictment respectively (see note

---

5. It was said, in Ingling, 303 F.2d at pages 303–304:

    "Hence, if it can reasonably be said that under certain circumstances the charge invoice was an evidence of indebtedness, then the indictment charged a public offense. It may be that the charge invoice was stamped with an endorsement that all the conditions of the credit card were incorporated therein; or that within the terms of the charge invoice there is stated a credit agreement and terms; or that the invoice contains therein an underlying credit agreement, expressly or impliedly; or that by the treatment accorded it by the parties, the invoice became an 'evidence of indebtedness' in some commercial sense."

6. Judge Murrah stated, 301 F.2d at page 790:

    " * * * In this posture of the case we are required to decide only whether a 'form of invoice' is legally incapable of being an evidence of indebtedness, not that in a particular circumstance it is not of such character. An invoice has been authoritatively described as 'a mere detailed statement of the nature, quantity, and cost or price of the things invoiced, and * * * as appropriate to a bailment as * * * to a sale.' See Dows v. National Exchange Bank, 91 U.S. 618, 630, 23 L.Ed. 214. But we have no authority for saying that an 'invoice' could not be cast in a form evidencing indebtedness, and since we cannot say so, this charge is invulnerable on colleral attack."

7. United States v. Rhea, W.D.Ark., 199 F.Supp. 301, where the question arose on a motion to dismiss the information; Williams v. United States, S.D.Cal., 192 F.Supp. 97.

8. United States v. Fordyce, S.D.Cal., 192 F.Supp. 93; United States v. Jones, W.D. Mo., 182 F.Supp. 146. The same result was reached in United States v. Young, W.D.Mo., 210 F.Supp. 640, where, although the question arose on a motion to dismiss, the trial court asked for and received a detailed stipulation as to the way in which the credit card system in question operated.

4, above), meet one of the Ingling criteria.[9]

But the suggested criteria set down in Ingling do not purport to be fully definitive in a case such as this where all of the facts are before us. We must determine whether the other circumstances of the case warrant the finding and conclusion that, as here used, those two vouchers or any of the others upon which convictions were obtained were evidences of indebtedness.

We are satisfied that they do not. It is true that the vouchers record the actual transactions, and are the only records of those transactions confirmed by the signature of the buyer. This, of course, is true of any department store sales slip.

Considering the context in which the statutory term "evidence of indebtedness" appears (see note 2), we think that something more than this is required to constitute a section 2311 "evidence of indebtedness." In this regard we agree with the reasoning of Judge Ridge, as set forth in his decision in United States v. Jones, W.D.Mo., 182 F.Supp. 146, 149. He there stated:

"* * * [W]e think the term 'evidence of indebtedness' has reference to some individual printed or written instrument for the transfer or payment of money, that contains on its face evidence of an obligation as to which some innocent person would act in relation to the terms thereof, that such document should be something other than mere evidence of a notation of general liability for goods, wares, or merchandise fraudulently purchased. * * *"

■ Viewed in the light of the facts of record, the charge vouchers here in question are not of the kind described in the quoted words. Neither the face of the instruments nor any evidence extrinsic thereto, whether or not within the knowledge of Barack, establishes that these charge vouchers were intended as commercial instruments which, as pieces of paper, have value to the holder, giving assurance to him that the papers' very existence indicates that the debts there evidenced continue to exist.

■ Quite to the contrary, a notation on each charge voucher involved in this case advises the buyer of merchandise to "address correspondence regarding this charge" to the seller. This implies that the normal relationship of buyer and seller is to continue with whatever effect that may have upon the debt evidenced by the voucher. Any defenses which a buyer may ordinarily invoke against the seller, such as failure of delivery, breach of warranty, misrepresentation, are available to undermine the buyer's liability. Under these circumstances neither the seller nor Hilton nor anyone else who might become a holder of the charge voucher could treat it as an evidence of indebtedness in the commercial sense as described above.

Section 2311 (note 2, above), defining "securities," lists a number of kinds of instruments in addition to "evidence of indebtedness." One of these is "draft." In view of the practical operation of the Hilton credit card system, it might be said that the charge vouchers are draft-like instruments, enabling a purchaser to draw on Hilton and empowering the seller to look to Hilton for payment. But this was not the theory on which the case was prosecuted and so we do not reach the question of whether the standing of these charge vouchers as "se-

---

**9.** We have reference to the suggestion in Ingling that the invoice might contain therein an underlying credit agreement, expressly or impliedly. The Barack vouchers introduced as Government exhibits 3 and 5 contain an express statement to the effect that the terms of sale are as stated in the applicable provisions of the "regulations and agreement" appearing in the Carte Blanche directory, which the buyer represents he has read and to which he agrees. The term "credit" is not expressly mentioned in the voucher reference to "regulations and agreement." However, it may reasonably be inferred from the words "the terms of sale" that this was the nature of the underlying agreement.

**624**

curities," could have been established on that basis.

We conclude that, under the established facts of this case, it was not established that the charge vouchers in question were "evidences of indebtedness" within the meaning of section 2311. The judgment is therefore reversed.