John Edward MERRILL, Appellant,

v.

UNITED STATES of America, Appellee.

No. 21388.

United States Court of Appeals
Fifth Circuit.

Nov. 24, 1964.

---

David R. Lewis, Jacksonville, Fla., for appellant.

C. S. Carrere, Asst. U. S. Atty., Edward·F. Boardman, U. S. Atty., Middle Dist. of Florida, Jacksonville, Fla., for appellee.

Before JONES and GEWIN, Circuit Judges, and ESTES, District Judge.

ESTES, District Judge.

John Edward Merrill, Appellant, hereinafter called defendant, was convicted in a trial by jury on both counts of a two-count information. Count One charged interstate transportation of a motor vehicle knowing the same to be stolen, in violation of 18 U.S.C.A. § 2312; Count Two charged interstate transportation of a thing (Shell credit card) used in falsely making and forging a security, in violation of 18 U.S.C.A. § 2314.

Defendant's motion to dismiss Count Two for failure to state an offense against the United States, his motions for judgment of acquittal at the conclusion of the government's evidence and at the conclusion of all the evidence, and his motion for new trial were all denied; and the Court sentenced the defendant to serve four years on each count, the sentences to run concurrently.

The questions presented on this appeal are whether the trial court committed prejudicial error in (1) determining that defendant was competent to stand trial and that the trial evidence was sufficient to raise a jury issue as to defendant's sanity at the time of commission of the alleged offenses, and the court's jury instructions on the defense of insanity;

(2) denying defendant the opportunity to take the witness stand in surrebuttal of government rebuttal evidence on the defense of insanity; (3) failing to instruct the jury on the elements of the offenses charged; and (4) holding that the credit card in question was a "thing" used in forging a "security" under 18 U.S.C.A. § 2314.

1.

Determination of the questions relating to the defense of insanity requires a brief résumé of the pertinent facts.

Pursuant to a court order, Dr. J. J. Cavanagh, Psychiatrist, United States Naval Hospital, examined defendant and testified before the court as to defendant's mental competency to stand trial. Thereupon the court entered its order of August 23, 1963 determining that defendant was able to understand the nature of the proceedings against him and to assist in his defense. Also on August 23, 1963, in compliance with a motion by defense counsel, the court entered an order providing for the examination of the defendant by an independent psychiatrist to determine his mental competency vel non as of June 7, 1963, the date of the alleged offenses. On August 28, 1963, Dr. John A. Ritchie, a physician and psychiatrist, was appointed to conduct such examination. Dr. Ritchie concluded that defendant was insane. As a result of these conflicting opinions, and at the request of defense counsel, the trial judge, by order of September 18, 1963, and "* * * in order to have the necessary time and facilities for a complete examination," committed the defendant, with his consent, to the Medical Center for Federal Prisoners, Springfield, Missouri, for further psychiatric examinations. At the time of defendant's admittance, he was interviewed by Dr. Glotfelty, Chief of Psychiatry, who prepared a memorandum, dated October 8, 1963, observing that the defendant appeared to be a paranoid schizophrenic who was unable to assist in his defense. The final report for the Medical Center staff, prepared by Dr. Glotfelty and dated October 16, 1963, concluded that the de-

fendant was a paranoid schizophrenic of long duration, in partial remission, "* * * but, this psychiatric condition does not affect him to the extent that he is unable to assist in his defense and co-operate with counsel * * *. His emotional discord is not so severe that it completely interferes with his capacity to understand the charges against him and assist counsel with his defense * * *" This report noted that while in the Medical Center for Federal Prisoners at Leavenworth, in 1956, defendant had admitted that at that time he was putting on an act in order to be found insane. The Medical Center at Springfield forwarded to the trial court an additional memorandum report, of November 4, 1963, stating that defendant had, on October 29, 1963, advised Dr. Glotfelty and other staff members that "he wished to be regarded as mentally ill" and that this was the reason for his behavior and remarks. After considering all available psychiatric reports and affording counsel an opportunity to present additional evidence (which they elected not to do), the Court entered a second order of November 26, 1963, concluding that defendant was "not presently insane or otherwise so mentally incompetent as to be unable to understand the proceedings against him or properly assist in his own defense."

■ The trial court's pretrial determination of the defendant's competency to stand trial, made in accordance with 18 U.S.C.A. § 4244, was not erroneous. See Meador v. United States (9 Cir., 1964), 332 F.2d 935.

■ At the trial the defense called only Dr. Ritchie, who testified that he was of the opinion that the defendant probably did not know right from wrong or have the ability to adhere to the right at the time of the alleged offenses as defendant was a chronic paranoid schizophrenic, which disability usually "develops during the teen ages." The rebuttal testimony of the government witnesses, Drs. Glotfelty and Cavanagh, that defendant was sane at the time of the alleged offense and at the time of trial,

and that of the lay witness LeBaron, certainly raised a jury issue on the defense of insanity. The trial court properly submitted this defense, under correct instructions, to the Jury. Argent v. United States (5 Cir., 1963), 325 F.2d 162; Howard v. United States, 232 F.2d 274 (5 Cir., 1956); Carter v. United States (5 Cir., 1963), 325 F.2d 697.

2.

Dr. Glotfelty testified at length on government rebuttal that defendant had admitted he was acting or feigning insanity. At the conclusion of government rebuttal the trial court refused to permit defendant's surrebuttal explanation, as requested by counsel for the defendant. While surrebuttal is within the sound discretion of the trial court and is usually denied to avoid repetition, it should have been permitted here.

■ The feigning admission was initially introduced by the government's rebuttal witness. Under the peculiar rule relating to burden of proof on the defense of insanity, where, as here, defendant has produced "some evidence" of mental disorder, the "burden of persuasion", the "risk of non-persuasion", or, less precisely, the "burden of proof" was upon the government to establish defendant's sanity beyond and to the exclusion of a reasonable doubt at the very moment the government witness first mentioned the feigning admission. Davis v. United States (1895), 160 U.S. 469, 486–488, 16 S.Ct. 353, 358, 40 L.Ed. 469, quoted in Argent v. United States (5 Cir., 1963), 325 F.2d 162, 170–171; IX Wigmore on Evidence, 3rd Ed. (1940), § 2485; American Bar Fnd., The Mentally Disabled and the Law (1961), p. 350.

■ In view of the interjection of the feigning admission during rebuttal and the conflicting and confusing testimony of the experts on this critical issue, we think it was error for the court to deny the defendant's request for permission to explain his admission to the court and jury. McCormick on Evidence (1954), p. 6; 4 Jones on Evi-

dence (1958), § 892, p. 1671; 23 C.J.S. Criminal Law §§ 1000, 1052, pp. 1052, 1228.

### 3.

After the defendant's counsel, in his argument to the jury, had virtually conceded defendant's guilt of the acts charged,[1] which was calculated to lead the court and jury to believe that defendant had admitted his guilt unless the jury found him insane, the trial judge instructed the jury:

"Now counsel for the defendant has simplified my charges in a sense, because I find it now unnecessary to go into those elements. The case has been made simple, in a certain sense, for you; simple in the sense that the issue can be sharply defined. It can be defined in terms of the sanity or the insanity of this defendant at the time of the alleged acts.

"In other words, Gentlemen of the Jury, you can start with this premise: that the defendant is guilty unless there has been a proof of his insanity at the time that the alleged offenses were committed." (Tr. 265).

█ The trial court, treating counsel's statement as a plea of guilty subject only to the defense of insanity, submitted only that defense to the jury. Although his counsel's argument was playing fast and loose with the court and jury—a practice we condemn—we cannot agree that his argument was in law a voluntary and understanding plea of guilty by the defendant, relieving the trial court of its duty to instruct the jury under Rule 30 F.R.Cr.P. on all of the essential elements of the offenses charged, with an instruction on the presumption of innocence. Walker v. United States (5 Cir., 1960), 285 F.2d 52, 61; 23A C.J.S. Criminal Law § 1190, p. 474, and § 1194, pp. 498–499.

---

1. "Members of the Jury, now that the case is over, I have a very simple, easy thing to talk to you about. Simple because there is only one item involved.

"I have no argument at all with the government's presentation of their case in chief.

"I think that if you sat here as jurors and considered the evidence before you, and that alone, on their case in chief, and came in with a finding of not guilty you would be derelict in your duty.

"There is no question in my mind, from the evidence that you have heard, and there should be no question in your minds, that sometimes toward the end of May, sometime in the beginning of June, that man over there took a car from Sacramento; drove it across the country; picked up the gentleman that you saw sitting back there, who testified before you, * * * that he picked him up and that they went to New Orleans and went on to Alabama and came to Florida.

"That is not our case. That is not our defense, Gentlemen.

"Our defense is simple, straightforward, and a matter of whether he knew what he was doing or not. The question of insanity.

"I told you this early yesterday morning, and this is the only thing I am going to talk to you about right now.

"I don't want to take time trying to poke any holes in the government's case, because, again, your duty as jurors is not to pick some little technicality and say 'By golly, they missed this.' That 'The defense was astute enough to point that out.' That is not your job; it is not your duty.

"When you took your oath as jurors here you assumed a role which puts the burden upon you to determine, beyond a reasonable doubt, the guilt of this man. Beyond a reasonable doubt, that this man, at the time he did these acts—which we don't deny he did—had the mental capacity to know right from wrong and to adhere to the right.

"And, therefore, after this great parade of government witnesses who went through the tedious painstaking job of tying in a car with a credit card, and a credit card with a sales slip, and a sales slip with an onion skin copy, and back and forth—that is not our argument, Gentlemen.

"We know because we have heard it and you know because you have heard it that he picked up a car in Sacramento and drove it across, using somebody else's credit card and the man whose credit card he was using was back there. There is no dispute about that." (Tr. 250–252)

In Dodson v. United States (4 Cir., 1928), 23 F.2d 401, 403, the court stated: " * * * The presumption of innocence is one of the fundamentals of the law. It is not to be minimized or denied to any one accused of crime. * * * One accused of crime has the right to have the jury take it to the jury room with them as the voice of the law * * *."

The denial of defendant's surrebuttal testimony together with failure to properly charge the jury constituted prejudicial error, requiring that the case be reversed and remanded for a new trial.

#### 4.

It therefore becomes necessary to decide appellant's final contention that the trial court erred in denying his motion to dismiss Count 2 of the information, charging in the language of the fourth paragraph of 18 U.S.C.A. § 2314, that appellant unlawfully transported in interstate commerce a "tool, implement and thing used and fitted to be used in falsely making, forging, altering and counterfeiting a security". The information then described the thing unlawfully transported as a "Shell Credit Card".

Section 2314 is a part of the National Stolen Property Act, as amended, 18 U.S.C.A. §§ 2311–2317, some of the terms of which are defined in 18 U.S.C.A. § 2311. The charge here concerns only that portion of the statute dealing with the interstate transportation of a "tool, implement or thing" which is, or can be, unlawfully utilized in connection with forging a "security".[2] The gist of the

offense charged is the transportation of the "thing"—not the transportation of a security.

Nevertheless, the government has correctly conceded that: "The resolution of the issue of whether or not the Shell gasoline credit card is a tool or thing fitted to be used in falsely making and forging a security necessarily depends upon the determination of the more basic issue of whether or not the credit sales invoice produced in a credit card *sales transaction* is an 'evidence of indebtedness' as a security is defined by § 2311, Title 18, United States Code." (Emphasis added)

In attempting to show that defendant had transported a "thing" used to make and forge a "security", the government proved the following "sales transaction". When a Shell credit card is presented to a Shell filling station dealer it is placed in a card imprinter which transfers the customer's name and account number from the credit card to a "credit sale invoice"—sales ticket, in duplicate, on which the purchases are handwritten and which is thereafter signed by the customer and a copy thereof given to him. The dealer presents the accumulated sales tickets to the Shell truck driver in lieu of cash for his purchases of wholesale gasoline. The Shell truck driver turns in the sales tickets to Shell's delivery department from which they are sent to and cleared through its data processing center; then the customers are billed with the charges by Shell Oil Company.[3]

---

2. It is significant that there are several other provisions of § 2314 which condemn the interstate transportation of stolen property; of persons connected with the execution or concealment of fraudulent schemes; and of falsely made, forged, altered, or counterfeited securities or tax stamps.

3. The pertinent "terms and conditions" imprinted on the Shell credit card are: "1. Customer named hereon is recommended for credit to authorized dealers * * * 2. Customer agrees to pay for all purchases made by any person wheth-

er authorized or not, using this card unless * * * 4. Customer agrees to pay for all purchases made with this card upon receipt of monthly statement * * *" The *only* provisions on the credit sale invoice are: " * * * THIS COPY CANNOT BE USED FOR TAX REFUND PURPOSES. . . The charges shown are hereby transferred to SHELL OIL COMPANY. The amounts shown include all taxes which the vendor or any prior vendor must pay or is obligated to collect * * *. This is a credit sale NOT a receipt."

Concededly the credit card itself is not a security. The term "securities" defined in § 2311 does not expressly include a "credit sale invoice" or "sales ticket", as the instruments here in question are denominated. Section 2311, however, does expressly include "any * * evidence of indebtedness * * * "—without defining this term—and " * * any instrument commonly known as a 'security' * * *."

Since the term "evidence of indebtedness" can have various meanings depending upon the context of its use, it must be determined what Congress meant by the language used in the statute.

Each of the "securities" specified in § 2311 consists of a single document which in itself is sufficient to establish a given right, relationship, or property interest. It is reasonable to conclude that the intended meaning of "evidence of indebtedness" in this Criminal Statute was similarly circumscribed. The detail with which Congress defined securities in § 2311 indicates that it would have included credit sale invoices in unmistakable terms if it had so intended. The credit card is simply a credit identification. In practically all present day credit "sales transactions" the purchaser presents some type of identification—such as a credit card—and signs a credit sales ticket or invoice, which evidences an obligation to pay the vendor. It by no means follows that men in commerce understand and this Act of Congress means that all credit identifications are a prohibited "thing" used to forge a "security", or that a credit sales ticket is such a "security".

By analogy between the first and fourth paragraphs of § 2314 it is also evident that Congress did not intend "securities" in the fourth paragraph to include credit sale invoices or sales tickets. The first paragraph requires that the security have a value of more than $5,000.00. This section is directed against the interstate transportation of property or valuable securities likely to be stolen, converted or taken by fraud. Cong.Rec. p. 6981, 73rd Cong., 2nd Sess. A credit sale invoice such as is here involved is not property of this kind. Nobody would steal a credit sale invoice, as only a dealer in an intra-company transaction (as described above) could receive any value for it.

The term value as used in the first paragraph of § 2314, an essential element of the offense, is defined in § 2311 to mean "the face, par, or market value". The credit sale invoice which forms the basis of the present information has neither a par value nor a market value. A credit sale invoice or sales ticket, regardless of the value of the merchandise embraced within it, is a writing incapable of having a "value" except to the vendor. Hence, it is not a security within the meaning of the first paragraph of § 2314.

Since the credit sale invoice is outside the intended reach of the first paragraph of § 2314, we cannot ascribe to Congress an intent to make "securities" one thing for the first paragraph and another for the fourth paragraph of the same section, particularly in view of the legislative history of the latter.[4]

■ We conclude that Congress employed the term "securities" in the usual commercial sense, to refer to instruments in themselves valuable to a thief. A credit sale invoice is not.

---

4. The definition of "securities" of § 2311 became law in 1934 at the same time that the first paragraph of § 2314 was enacted. May 22, 1934, c. 333, 48 Stat. 794. The provision relating to forgery apparatus—the "thing"—was not originally passed until August 3, 1939, c. 413, 53 Stat. 1178, and included " * * * any bed piece, bed plate, roll, plate, die, seal, stone, type, or other tool, implement or thing * * *." By amendment on June 25, 1948, c. 645, 62 Stat. 806, this provision became the third paragraph of the section and was shortened to " * * * any tool, implement, or thing * * * "; which, by amendment, became the present fourth paragraph. July 9, 1956, c. 519, 70 Stat. 507. The meaning which the term "securities" had when enacted in 1934 in connection with the first paragraph of § 2314 was retained when the present fourth paragraph was passed.

■ The difficulty with the government's position resides in the fact that proof that a credit card and a credit sales ticket were employed in a fraudulent "sales transaction" will not sustain a conviction under § 2314. A "sales transaction" is not a "thing" that may be transported nor a "security."

■ Section 2314 is a criminal statute ". . . which must be strictly construed." Prussian v. United States (1931), 282 U.S. 675, 677, 51 S.Ct. 223, 75 L.Ed. 610. From the government's standpoint the most that can be said is that the meaning of the statute is doubtful. An ambiguity in such a statute is not to be resolved by an interpretation "to embrace offenses not clearly within the law." Krichman v. United States (1921), 256 U.S. 363, 367–368, 41 S.Ct. 514, 516, 65 L.Ed. 992 (1921). Any doubt must be resolved against broadening its scope. United States v. Adielizzio (2 Cir., 1935), 77 F.2d 841, 844. If Congress intends to give federal protection to every conceivable credit "sales transaction," it may expressly so provide, with full realization of the implications of such coverage. It is for the legislature to say what shall be a crime. " * * * [I]t is not permissible for the court to search for an intention that the words themselves do not suggest." Fasulo v. United States (1926), 272 U.S. 620, 628, 47 S.Ct. 200, 202, 71 L.Ed. 443. The reach of this Act should not be extended to practically all credit "sales transactions" on an *ad hoc* basis.

■ Finally, as the Shell credit card is not a "thing . . . used in forging a security" within the purview of § 2314, Count Two of the information should be dismissed. Barack v. United States (9 Cir., 1963), 317 F.2d 619; United States v. Crouch (D.C.Del., 1964), 224 F.Supp. 969; United States v. Fordyce (S.D.Cal., 1961), 192 F.Supp. 93; United States v. Jones (W.D.Mo., 1960), 182 F.Supp. 146; United States v. Young (W.D.Mo., 1962), 210 F.Supp. 640. See also: Lewis v. United States (10 Cir., 1962), 301 F.2d 787; Ingling

v. United States (9 Cir., 1962), 303 F.2d 302 [Section 2255 cases].

The judgment and conviction is reversed and the case remanded for further proceedings consistent with this opinion.