UNITED STATES of America,
Plaintiff-Appellee,

v.

Harold WEXLER, Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Alan ANGRIST, Defendant-Appellant.

Nos. 993, 1009, Dockets 80–1001, 80–1002.

United States Court of Appeals,
Second Circuit.

Argued April 15, 1980.

Decided May 22, 1980.

Joel J. Spector, New York City (Demov, Morris, Levin & Shein, New York City, Arthur Birnbaum, New York City, of counsel), for defendant-appellant Wexler.

John M. Burns, III, New York City, for defendant-appellant Angrist.

Arlene R. Lindsay, Asst. U. S. Atty., New York City (Edward R. Korman, U. S. Atty., E.D.N.Y., Mary McGowan Davis, Cheryl M. Schwartz, Asst. U. S. Attys., Brooklyn, N. Y., of counsel), for plaintiff-appellee.

Before LUMBARD, MULLIGAN, Circuit Judges, and SPEARS,* District Judge.

* Honorable Adrian A. Spears, District Judge for the Western District of Texas, sitting by designation.

SPEARS, District Judge:

Defendants Alan Angrist and Harold Wexler appeal from judgments of conviction after a jury trial of unlawful interstate transportation of forged securities (Count 3), making misrepresentations to a bank insured by the Federal Deposit Insurance Corporation (Count 4), and conspiracy to commit those offenses (Count 1). The defendants were acquitted on a separate unlawful transportation count (Count 2), and each was sentenced on Counts 1 and 3 to concurrent terms of two years in prison to be followed by three years probation on Count 4.

On appeal the defendants raise the following arguments: (1) that an equipment lease is not a "security" within the meaning of 18 U.S.C. § 2314, and that there was insufficient evidence to establish that the defendants transported a forged equipment lease in interstate commerce (Count 3); (2) that the district court erred in permitting government counsel to introduce evidence of uncharged similar acts; (3) that the counts charging violations of 18 U.S.C. § 1014 (Count 4) and 18 U.S.C. § 371 (Count 1) are legally insufficient and should be dismissed; (4) that the evidence was insufficient to convict defendants of either the conspiracy count (Count 1) or the misrepresentation to a bank count (Count 3); (5) that Angrist's conviction should be reversed because he did not receive adequate representation during trial; and (6) that the district court erred in failing to charge the jury with respect to the use of inferences, the limited use of uncharged similar acts evidence, and the definition of a security within the meaning of 18 U.S.C. § 2314. Finding these arguments to be without merit, we affirm.

In 1970, Wexler and Angrist formed Alphabetland, Inc., a corporation organized to operate pre-school nurseries and summer day camps, primarily in the New York area. Angrist held the position of president and Wexler acted as executive vice-president and secretary of the corporation. When fund raising efforts failed in 1972, the defendants began to offer Alphabetland franchises, which involved the selling of an existing school or the starting-up of a new school in return for cash and a series of promissory notes. Where a new school was involved, Alphabetland would offer a nursery school equipment package and the franchisee often financed this package by entering into an "equipment lease" with Alphabetland. Under the equipment lease, title to the equipment was retained by Alphabetland and the franchisee was obligated to make lease payments over a 60 month period. Tuition payments were sent directly to Alphabetland, which deducted any royalty, lease and note payments due and then forwarded the balance to the particular franchisee.

In 1974, Alphabetland was still experiencing financial difficulty, and in an effort to increase its operating capital Michael Paschel, a certified public accountant, was employed to assist in seeking financing. Alfred Grunow, an equipment leasing broker, also became associated with Alphabetland. Paschel and Grunow were instrumental in Alphabetland's efforts to obtain financing, but the evidence established that the loans were negotiated and finalized by the defendants. Between 1974 and 1975, Alphabetland obtained four loans from three separate companies.

These loans, and documents submitted in connection with the loan applications, formed the basis for the indictments returned in this case.

### Middle States Leasing Loan

In February, 1974 Grunow arranged for Alphabetland to discount franchisees' notes to Middle States Leasing Corporation (MSL). Arrangements were also made for MSL to lend money to Alphabetland against the equipment leases of its franchisees. A vice-president of MSL testified that MSL loaned $90,000 to Alphabetland against the discounted notes, and approximately $270,000 in connection with both the notes and the leases. The same officer also testified that he had several conversations with both defendants, and that Angrist agreed to submit copies of four promissory

notes which were to form the major portion of the collateral.

The copies, which were mailed to MSL, allegedly represented the promissory notes of four Alphabetland franchisees, executed in connection with the purchase of four schools. Both defendants, who were residents of Long Island, New York, attended the loan closing in Passaic, New Jersey, at which time the defendants submitted the original four promissory notes. The evidence at trial established that the signatures on two of these notes had been forced. One of the notes had been signed by Frances Welner, a secretary at Alphabetland. After having been granted immunity, Mrs. Welner testified that one of the defendants (she thought Angrist) had asked her to sign the name of the franchisee on the note. Arthur Kirsch, another Alphabetland employee, who also testified under a grant of immunity, stated that he saw the secretary sign the note and that both defendants were present when it was signed.

In connection with the equipment leases, MSL agreed to discount five leases, with defendants receiving $30,000 per lease.[1] In return, MSL received an assignment of the franchisees' equipment leases, which gave MSL the right to collect over $40,000 in lease and interest payments from each franchisee. Each lease to be discounted was accompanied by a series of documents, and when MSL decided that it would discount a particular lease, both defendants would travel to the MSL office and produce the original supporting documents. It was subsequently determined that each of the equipment leases, as well as the supporting documents, were forgeries. All of the persons whose purported signatures were on the leases testified at trial, stating that they did not sign the equipment leases or the other documents submitted to MSL. MSL's vice-president testified that if the leases had been genuine, they would have

had commercial value, in that they represented the right to receive payments for the equipment. In addition, he testified that the leases were marketable, in that they could be discounted to yet another financial institution. Although the point is disputed, it appears from the evidence that the forged leases and supporting documents were delivered to MSL by both defendants. The government's handwriting expert testified that the signature on one set of documents had been forged by Angrist.

### London Company Loan

In May, 1974, defendants obtained a $100,000 loan from the London Company, headed by Edward Chwatt. This loan was secured by a general pledge of all of Alphabetland's present and future assets, and seven promissory notes which turned out to be forged.[2]

### Maryland National Bank Loan

After the lease discounting arrangement with MSL was concluded, Grunow introduced Wexler and Angrist to Richard Nee of the Maryland National Bank (MNB). Nee testified that although most of his contacts were with Angrist, on occasion he spoke with Grunow concerning the loan application. He testified that most of the data he received was sent by Angrist, and that the defendants failed to advise him of the existence of the outstanding obligation to the London Company. The documentation submitted to MNB consisted of financial statements, a list of opening dates for recently constructed schools, a list of schools then under construction, a notes receivable list, a mortgages and notes payable list, and a term guaranty agreement.

Wexler and Angrist represented to MNB that with respect to the list of schools under construction, the land for each had been purchased, and that in most cases construc-

---

1. Although under the typical equipment lease a franchisee paid approximately $30,000.00 for the package, excluding interest, it was established at trial that Alphabetland paid approximately half that much for each equipment package.

2. Defendants were not charged with unlawful transportation of these documents. This loan was relevant in that the government alleged that defendants intentionally failed to advise a federally insured national bank of its existence in a subsequent loan application.

tion was actually under way. An Alphabet-land employee testified that none of the schools on the two lists were actually under construction, although some of them were eventually opened. The list of notes receivable was also fraudulently prepared, in that MNB was advised that several of them were not already pledged as collateral, when in fact they were. Prior to approving the loan, MNB conducted a Uniform Commercial Code filing search, and it was discovered that the London Company had filed a lien against all present and future assets of Alphabetland. When confronted with this discovery, defendants explained that the London Company was acting merely as a guarantor for certain loans. In support of this explanation the defendants provided MNB with a copy of a "term guaranty agreement," which was purportedly signed by Mr. Chwatt, the holder of the London Company Loan, and which confirmed the false terms described by the defendants. The loan application was approved, and both defendants attended the loan closing. Mr. Chwatt testified that although the signature appeared to be his, he never signed such a document.

In spite of these various maneuvers (or perhaps resulting from them) Alphabet-land's financial condition deteriorated to the point where in 1976 a petition in bankruptcy was filed on its behalf.

### The Equipment Lease—Security Issue

Despite a concession at trial[3] that this was not an issue, both defendants strenuously argue that an equipment lease is not a "security" within the meaning of 18 U.S.C. § 2311. The National Stolen Property Act, 18 U.S.C. § 2314, proscribes the transportation in interstate or foreign commerce of stolen goods, wares, and merchandise with a value of $5,000 or more, stolen securities, or falsely made, forged, altered, or counterfeited securities. 18 U.S.C. § 2311 defines the term "securities" to include:

. . . any note, stock certificate, bond, debenture, check, draft, warrant, traveler's check, letter of credit, warehouse receipt, negotiable bill of lading, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate; certificate of interest in property, tangible or intangible; instrument or document or writing evidencing ownership of goods, wares, and merchandise, or transferring or assigning any right, title, or interest in or to goods, wares, and merchandise; or, in general, any instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, warrant, or right to subscribe to or purchase any of the foregoing, or any forged, counterfeited, or spurious representation of any of the foregoing; . . .

Counsel for the government insists that under *United States v. Knuckles*, 581 F.2d 305 (2d Cir.), *cert. denied* 439 U.S. 986, 99 S.Ct. 581, 58 L.Ed.2d 659 (1978), defendants are precluded from abruptly shifting their position to claim that an equipment lease is not a security. In *Knuckles*, we held that "[c]ounsel may not adopt one view of the proof in the trial court, thereby limiting the legal issues, and then adopt a different view of the evidence in order to raise other issues on appeal." 581 F.2d at 310. This was an amplification of our holding in *United States v. Braunig*, 553 F.2d 777, 780 (2d Cir.), *cert. denied*, 431 U.S. 959, 97 S.Ct. 2686, 53 L.Ed.2d 277 (1977) that:

Rule 12(f), F.R.Crim.Pro. makes clear that '[f]ailure by a party to raise defenses or objections or to make requests which must be made prior to trial, . . . shall constitute waiver thereof, but the court for cause shown may grant relief from the waiver.' The law in this Circuit is clear that where a party has shifted his position on appeal and advances argu-

---

**3.** The record reflects and the briefs confirm the fact that defendants' counsel repeatedly conceded that equipment leases were included within the meaning of "securities" as used in Title 18 U.S.C. §§ 2311 and 2314.

ments available but not pressed below, and where that party has had ample opportunity to make the point in the trial court in a timely manner, waiver will bar raising the issue on appeal. (citations omitted)

█ The defendants argue that the concession by trial counsel has no effect on the present appeal because under Rule 12(b)(2), Fed.R.Crim.P., an objection that an indictment fails to charge an offense may be raised for the first time on appeal, and because a "prosecutor, judge and defense counsel acting in concert may not create a crime where none exists." Whatever force this argument may have in other contexts, it is evident that it is not helpful to the defendants here. A motion to dismiss for failure to charge an offense, although cognizable for the first time on appeal, does not lie where, as in this case, the indictment tracks the language of the statute and sufficiently sets forth the elements of the crime charged. As government counsel correctly points out, the issue is not whether count three on its face fails to charge an offense, since it clearly does, but whether the government can *prove* that a violation thereof occurred by relying on evidence concerning the equipment leases. One of the obvious elements of the offense charged under 18 U.S.C. § 2314 is interstate transportation of "falsely made, forged, altered, or counterfeited securities." Count three charged that defendants, "with unlawful and fraudulent intent, did transport in interstate commerce from West Hempstead, New York to Passaic, New Jersey, a falsely made and forged security, namely, an equipment lease bearing the name David Kelly, knowing said lease to be falsely made and forged." This count specifically and adequately described all of the essential elements of the offense it was alleged that the

defendants committed. Thus we are not confronted with a situation where "a prosecutor, judge and defense counsel acting in concert" created a crime where none existed; a person who transports a forged security in interstate commerce with unlawful and fraudulent intent, and knowing the same to have been forged, has committed a crime under 18 U.S.C. § 2314. The concession simply made it unnecessary for the government to prove that the equipment lease was a security. Since it is our view that the equipment lease *was* a security within the meaning of § 2311, the defendants were in no way prejudiced by the concession, whether the issue was waived or not.

█ An "equipment lease" is not specifically included in the definition of "securities" in 18 U.S.C. § 2311, so we must determine whether such a lease is a writing which constitutes "evidence of indebtedness," or which evidences "ownership of goods, wares, and merchandise, or [the] transferring or assigning [of] any right, title or interest in or to goods, wears and merchandise." We have not been directed to any reported decision which addresses this specific issue, but in the case of *United States v. Canton*, 470 F.2d 861 (2d Cir. 1972), this Court, in holding that a motor vehicle registration was neither a "certificate of interest in property" nor a "document or writing evidencing ownership of goods, wares and merchandise," and, therefore, not a security within the meaning of § 2311, nevertheless, did furnish some guidance by noting that securities are "instruments which have *intrinsic value* and *are recognized and used as such in the regular channels of commerce*." 470 F.2d at 864.[4] (Emphasis added).

---

4. In *United States v. Elliot*, 571 F.2d 880 (5th Cir.), *cert. denied, sub nom., Hawkins v. United States*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978), an automobile title certificate issued under Georgia law was distinguished from the New York automobile registration certificate with which this Court dealt in *Canton*. A certificate of title in Georgia was just that, while a registration certificate in New York was only for the purpose of showing that "the motor vehicle rightfully be operated on public highways" and "was never intended . . . as a certificate of title." Thus, a certificate of title was held in *Elliot* to be a security, whereas, in *Canton* a registration certificate did not qualify under the security definition. In this connection, it is interesting to note that the Court gave an expansive reading to § 2311 in

In 1969, a New York Court described equipment leasing as being:

a recent device whereby users of goods are enabled to have sole and exclusive use thereof for such periods of times as are economically beneficial to them at advantageous costs. It has become a widely used substitute for purchase, with the lessor, in economic reality, taking the place of a financing agency and the lessee paying the equivalent of the full purchase price, plus interest, within the minimum lease period. The lessee, in effect, is the true purchaser. Under present tax laws . . . it is foreseeable that this method of transferring the right to use goods will encompass a sizeable portion of the volume of commercial transactions which have the use of goods (rather than their consumption) as their immediate economic end. *Hertz Commercial Leasing Corp. v. Transportation Credit Clearing House*, 59 Misc.2d 226, 298 N.Y.S.2d 392 (Civil Court of City of N.Y.), *rev'd on other grounds*, 64 Misc.2d 910, 316 N.Y.S.2d 585 (N.Y.Sup.Ct.1970).

As one author has stated, "[t]he importance of leasing as a way of financing facilities and equipment needed by commerce and industry can hardly be overstated. In the last ten years it has mushroomed at an accelerating pace." Lefevre, *The Tax Law of Lease Transactions Revisited*, 53 TAXES 764 (1975).

It should be noted that under the terms of the equipment leases in this case, the lessee had no option to terminate the lease, and in the event of a default by the lessee, Alphabetland could take possession of the equipment and sell it, retain all prior payments of rent, and hold the lessee for the balance of the unpaid rent. Since the lease specifically provided that the equipment was to be considered personal property, it is difficult to understand defendants' argument that the equipment should be considered fixtures. In view of the nature of the equipment, we believe the equipment leases obviously transferred an "interest in . . . goods, wares, and merchandise," and thus could be considered securities within the meaning of § 2311. More important, however, is the fact that the equipment leases have "intrinsic value" and "are recognized and used as such in the regular channels of commerce." *United States v. Canton, supra.* The loan officer at Middle States Leasing testified that the leases could have been sold to any other financial institution, and that the loans would not have been made without the equipment leases as collateral. His testimony further demonstrated that the leases were valuable, in that Alphabetland would receive payments on the equipment it was renting to the franchisees with an interest return. The fact that Alphabetland used the leases as collateral for loans from Middle States Leasing would seem to foreclose defendants from now asserting that the leases were without value.

In short, defendants ask this Court to look to form over substance—to hold that

---

United States v. Speidel, 562 F.2d 1129 (8th Cir. 1977), cert. denied, 435 U.S. 915, 98 S.Ct. 1468, 55 L.Ed.2d 505 (1978), and found that a quitclaim deed was a security. However, in United States v. Dunlap, 573 F.2d 1092 (9th Cir. 1978), the Court refused to follow the expansive reading concept and held that a department store scrip was not covered by the definition in § 2311. On the other hand, in United States v. Austin, 462 F.2d 724 (10th Cir. 1972), cert. denied, 409 U.S. 1048, 93 S.Ct. 518, 34 L.Ed.2d 501 (1972), the Court was of the opinion that a loan commitment letter, which was sold for a substantial consideration, and which "appeared to be an enforceable obligation" that contemplated a flow of funds, was a security within the statutory definition. Credit sales invoices were held not to be securities in Merrill v.

United States, 338 F.2d 763 (5th Cir. 1964), the Court stating that "Congress employed the term 'securities' in the usual commercial sense, to refer to instruments in themselves valuable to a thief." 338 F.2d at 769. That same Court later held in United States v. Jones, 450 F.2d 523 (5th Cir. 1971), that an airline ticket was not a security, pointing out that not all instruments having value are securities, and concluding that an instrument in order to be a security must not only have value in itself, but it must also "evidence indebtedness in the usual commercial sense." 450 F.2d 525. Other cases could be cited covering various categories of documents, but it appears that the decision in each case depends upon the particular facts of that case.

the equipment leases were "true" leases or bailments for hire. The fact is that the leases in this case were not bailments for hire, but were intended to be used as security. As one author has noted, "it is not uncommon to find that what is called an ordinary lease . . . is in substance a lease . . . for security—that is, to most pre-code and post-code lawyers, 'a conditional sale' . . . ." Coogan, *Leases of Equipment and Some Other Unconventional Security Devices: An Analysis of UCC Section 1–201(37) and Article 9* in Bender's Secured Transactions under the Uniform Commercial Code § 4A.01 (1977). In our opinion, each equipment lease in this case is the type of instrument Congress intended to and did include in the definition contained in § 2311.

### Interstate Transportation

The defendants contend that even if this Court determines that an equipment lease is a security within the meaning of § 2311, Count three must be dismissed because the evidence failed to establish that the defendants knowingly transported the forged equipment leases in interstate commerce. As previously pointed out, the loan officer at Middle States Leasing testified that both defendants were present at the loan closings, and that they presented the original supporting documentation at that time. On at least one occasion, the loan closing was attended solely by the defendants and representatives of Middle States Leasing, and the defendants were the only persons present at the closing who had access to or were in a position to produce the original equipment lease. The evidence established that the offices of Alphabetland were in Long Island, that both defendants resided in Long Island, and that the loan closings were held in Passaic, New Jersey. The obvious inference to be drawn from this evidence was that the defendants travelled from Long Island to New Jersey in order to deliver the documents to Middle States Leasing. The evidence was clearly sufficient to present a jury issue, and the jury resolved that question against the defendants. The testimony of Alphabetland employees, as well as other evidence, established the fact that the defendants knew the lease agreements were forged when they were delivered to Middle States Leasing.

### Uncharged Similar Acts

The defendants insist that the District Court erred in allowing evidence concerning forged promissory notes submitted in connection with the London Company Loan. Prior to the swearing of the jury, defendants objected to the government's intention to present evidence concerning the London Company loan on the ground that it would expose before the jury evidence of forged promissory notes given by Alphabetland to the London Company—a crime not charged in the indictment. Counsel for the government replied that this evidence was pertinent to Count four of the indictment, which charged defendants with misrepresenting the financial condition of Alphabetland to Maryland National Bank by failing to disclose the existence of the London Company loan. We believe that the District Court properly admitted the London Company loan evidence as being relevant to the charges contained in Count four of the indictment. As we held in *United States v. Arroyo-Angulo*, 580 F.2d 1137 (2d Cir.), *cert. denied*, 439 U.S. 913, 99 S.Ct. 285, 58 L.Ed.2d 260 (1978),

> It is well established that evidence of other crimes, if relevant, is admissible against a defendant except when offered solely to prove criminal character or disposition. (citations omitted) One purpose for which such similar acts may be introduced is to prove knowledge, intent, identity, and plan or design. Fed.R.Ev. 404(b); *United States v. Miller*, 478 F.2d 1315, 1318 (2d Cir.), *cert. denied*, 414 U.S. 851, 94 S.Ct. 144, 38 L.Ed.2d 100 (1973). 580 F.2d at 1149.

In addition to the fact that the evidence was properly admitted under the above

mentioned theories, it is clear that the evidence in question was admissible as demonstrating a connected or inseparable transaction from the crimes charged in the indictment. *See United States v. O'Connor*, 580 F.2d 38, 41 (2d Cir. 1978); *United States v. Calfon*, 607 F.2d 29 (2d Cir. 1979).

### Sufficiency of the Fourth Count

 Defendants maintain that the fourth count of the indictment should be dismissed because it does not sufficiently state the essential facts constituting the offense charged. This contention was not raised in the District Court and has therefore been waived. Rule 12(b)(2), Fed.R.Crim.P.; *United States v. Rodriguez*, 556 F.2d 638, 641 (2d Cir. 1977), *cert. denied*, 434 U.S. 1062, 98 S.Ct. 1233, 55 L.Ed.2d 762 (1978). Moreover, an examination of the defendants' arguments under this point reveals that they are patently without merit. Count four set forth the date and place of the offense, identified the bank that was misled, listed all of the essential elements of the offense, identified the specific documents used to mislead the bank, and stated the manner in which these documents were misleading.

### Sufficiency of the Evidence

 Viewing the evidence in a light most favorable to the government, as we must, there is no merit to the defendants' arguments that the evidence at trial was legally insufficient to convict them of either the conspiracy count or the unlawful misrepresentation to a bank count.

### Adequacy of Angrist's Representation at Trial

 Angrist's claim that he did not receive adequate representation before or during trial is meritless. As we stated in *United States v. Rodriguez, supra*,

> In any complicated case every lawyer . . . is likely to make both procedur-

al and substantive errors, often reflecting mistakes of judgment under pressure. He is also apt to make minor errors of omission. But that is no reason to embrace the specious argument that a defendant has been prejudiced if his counsel fails to raise even meritless points in an effort to preclude a just conviction. 556 F.2d at 642.

### The Court's Charge

 The defendants argue that the Court's failure to charge the jury concerning the means of determining whether an equipment lease was a "security" denied them a fair hearing. In this connection, it is significant that the defendants neither requested such a charge, nor interposed any objection when the Court indicated that in light of the concession made, he would charge the jury as a matter of law that an equipment lease was a security within the meaning of the statute. Regardless, therefore, of whether or not the question might normally be one for the jury, the action of the Court was proper under the circumstances of this case.

### Conclusion

Having fully considered all contentions made by the defendants, and finding them wholly without merit, we are of the opinion that the judgments of conviction as to both defendants should be, and the same are hereby,

AFFIRMED.