**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**William J. JOHNSON,
Defendant-Appellant.**

**No. 82–1136.**

United States Court of Appeals,
Fifth Circuit.

Feb. 25, 1983.

Opinion on Granting of Rehearing
En Banc April 18, 1983.

---

Leo J. Hoffman (court-appointed), Dallas, Tex., for defendant-appellant.

John Mitchell Nevins, Asst. U.S. Atty., Dallas, Tex., for plaintiff-appellee.

Before CLARK, Chief Judge, RUBIN and WILLIAMS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge.

Johnson appeals a criminal conviction for interstate transportation of a falsely made security, 18 U.S.C. § 2314, and for causing interstate telephone calls to be made pursuant to a scheme of securities fraud, 18 U.S.C. § 1343. The primary issue on appeal concerns the district court's determination that the documents in question were "securities" within the meaning of the statute, as a matter of law. We affirm the district court.

### FACTS

In 1977, William J. Johnson helped to launch a California corporation, International Vaults, Ltd. (I.V.), to engage in the trading of gold and other precious metals. He then left the company in 1978. I.V.'s attorneys advised the company in 1980 that it would need to become a registered company with the California Department of Corporations in order to continue trading metals and commercial paper.[1] The company suspended operations temporarily and began to prepare the financial statements needed for registration with the proper government bodies. In mid-November, 1980, the California Department of Corporations began an investigation of I.V.'s compliance with state securities laws.

The state's investigation touched off a ripple of concern within the company regarding I.V.'s financial condition, and the company hired an accountant and an independent auditor to verify the assets of the company. One of the company's major assets was an $8 million promissory note owed by Lee Eastman, I.V.'s principal agent for buying and selling the Alaskan gold. Neither Eastman nor the $8 million could be located, and the auditors told company officials that the verification process of the audit was "falling behind schedule." The ripple of concern became a wave of anxiety, and I.V. brought Johnson back on board in December, 1980 to help verify the assets, weather the storms of the outside audit, and generally calm the troubled waters surrounding I.V.

Johnson knew I.V. was a vessel in distress when he rejoined. His first effort, once on board, was to seek an $8 million asset to replace the unconfirmable promissory note owed by Eastman. In late January, 1981, Johnson traveled to Dallas to meet with William Brinlee, a friend in the gold business. Brinlee gave Johnson a document denominated "Gold Certificate Contract" made out to "Int. Vaults/William J. Johnson." The document purported to assign 35,000 ounces of gold held in a bonded warehouse in Dallas.[2] The exact meaning

---

1. During 1980, I.V. was offering to investors "promissory certificates" that promised a return of 8% monthly, or 96% per year. I.V. planned to use the money to purchase gold directly from Alaskan mines for resale in the commercial market, hoping the small markup and fast turnaround would both repay the 96% per year to investors and generate a profit for itself. The certificates were not registered as securities under state or federal laws. The company stopped offering these "promissory certificates" in mid-November, 1980, under pressure from the company's attorneys and from the California Department of Corporations, and they are not in question in the case before us.

2. The contract was worded as follows:

GOLD CERTIFICATE CONTRACT
\* \* \* \* \* \*
DATE: JAM. [sic] 29, 1981

of the document is in dispute in this case. Whatever its meaning, however, its clear purpose was to placate the auditors in their search for verifiable assets.

Johnson acquired temporary rights to the document by promising to return the certificate within three days and to pay Brinlee $75,000. The document did not mention the temporary nature of the transaction, and the original did not contain an inscription that the gold would need to be paid for upon delivery, if delivery were ever to take place. Brinlee's duplicates of the document had this "C.O.D." provision added on.

Johnson flew from Dallas back to California with the document in hand, an act later to be labeled "in interstate commerce." I.V.'s principals immediately informed the auditors that the Eastman note had been "retired" but that this new Brinlee note could be confirmed to represent the needed $8 million. The auditors made several attempts to verify the existence of the gold underlying the Brinlee certificate, including making certain telephone calls to Dallas. These calls would later be labeled "interstate use of wire signals." The attempts were unsuccessful, and the auditors were not yet satisfied.

Johnson flew back to Dallas and met with Brinlee again. This time, Johnson returned to California with a "bill of sale" for $8 million worth of coal, which he acquired from Brinlee. Despite attempts by I.V. officials other than Johnson to represent the coal contract as being "bought" with the gold contract which in turn was "bought" with the Eastman note, the independent auditors would not verify the assets of I.V. The company capsized.

The federal government then brought criminal charges against Johnson. The charges included one count of "transporting in interstate commerce with the requisite unlawful intent and knowledge, a falsely made security in violation of 18 U.S.C. § 2314," and one count of "causing to be made a telephone call in furtherance of this fraudulent scheme in violation of 18 U.S.C. § 1343." After a jury trial, Johnson was found guilty on both counts, and given a three year sentence on the interstate transportation count and a five year suspended sentence on the interstate wire signal count.

Johnson now appeals, arguing that the district court erred in instructing the jury that the Gold Certificate Contract was a security as a matter of law. He argues,

DELIVER TO: INT. VAULTS, LTD/WM. J. JOHNSON only—17,000—SEVENTEEN THOUSAND—... troy ounces of gold on demand after—360—days from the date hereon.
[SIGNED] IMF SYSTEMS, INC.
–CONDITIONS–
1. GOLD shall be dleivered [sic] in bars of one thousand Trou [sic] ounces, plus or minus five (5) percent and shall be 999.5 fine GOLD or better.
2. DELIVERY shall be made to any bank or bonded warehouse in Dallas, Texas, for the account of the purchaser.
3. No interest shall be paid on this certificate.
4. This certificate can be transferred only on the books of I.M.F. Systems, Inc. by written authorization of I.M.F. Systems, Inc. to the Transfer Agent. This certificate cannot be divided or sold in fractional shares.
5. This certificate shall be redeemable in GOLD as specified in paragraph one, and the purchaser acquires no right or rights to any ore, mines, mineral deposits, smelters, processes, formulas, trade secrets, or operations, of any nature belonging to I.M.F. Systems, Inc. and I.M.F. Systems Inc. shall not be obligated to deliver GOLD from any particular mine, or refined by any specific process.
6. This certificate shall not be sold, transferred, traded or assigned as collateral.
7. Purchaser agrees that this certificate shall be for his own investment account and not for resale.
8. Owner shall surrender this certificate on or after the due date and sign a receipt for the amount specified herein. Delivery before the due date shall be at the option of I.M.F. Systems, Inc.
9. This certificate is backed by an original Bill of Sale and an original assigment [sic] of interest in a bonded warehouse receipt. These documents are on deposit with Security Trust Company of Dallas, Texas and shall be held by The Trust Company until this certificate is redeemed by delivery of the GOLD.
The Certificate was signed by Massner and Johnson.

first, that it was impermissible for the district court to determine the status of the document as a security rather than leaving the question entirely to the jury. Second, Johnson urges that the ruling was erroneous even if it was within the judge's power to make. Johnson also contends that the jury's verdict on the wire signals charge does not have sufficient basis in the evidence. Finally, he urges that the court erred in admitting certain evidence. We address each contention in turn.

## WAS THE LEGAL FINDING OF "SECURITY" A VIOLATION OF THE RIGHT TO A JURY TRIAL?

Johnson's fundamental objection to the proceedings below is that the district court ruled that the Gold Certificate Contract was a security as a matter of law. Johnson urges us to adopt a rule that such a determination in a criminal proceeding is always for the finder of fact. We hold that his contention is not the law.

Johnson urges that if a judge has the authority to determine status as a security, this power is limited in a criminal case by the defendant's countervailing constitutional right to a jury trial. In this proceeding, Johnson claims that the charge to the jury which required the jury to accept the Gold Certificate Contract as a security was treading on the exclusive terrain of the jury's factfinding duties, in violation of his Sixth Amendment rights.

We recognize, of course, Johnson's right to a full jury trial untempered by a judge's preemptive coloration of the facts. This right means that there may be no partial summary judgment on factual questions. *United States v. Sheldon,* 544 F.2d 213, 221 (5th Cir.1976); *United States v. Manuszak,* 234 F.2d 421 (3d Cir.1956) (the existence of a theft at all is a jury question). As was stated in *United States v. Austin,* 462 F.2d 724, 737 (10th Cir.), *cert. denied,* 409 U.S. 1048, 93 S.Ct. 518, 34 L.Ed.2d 501 (1972): "It is unquestionably desirable to submit all issues in a criminal case to the jury and to fail to do so, even where the issue appears clear to the judge,

is potentially dangerous and at best hazardous."

Johnson urges that under the circumstances of this case, finding the certificate to be a security necessitates an adoption of factual testimony presented at trial. Unlike a bank check, travelers check, or other document that is expressly, unequivocally covered under the statute, the Gold Certificate Contract falls into a more nebulous description under the statute. That description includes an "instrument or document or writing evidencing ownership of goods, wares, and merchandise, or transferring or assigning any right, title, or interest in or to goods, wares, and merchandise . . . ." 18 U.S.C. § 2311.

The wording of the certificate falls literally into the statutory definition by purporting to "assign" gold. In spite of this precise conformity with the definition, Johnson claims that the statutory definition requires a factual determination. He contends that any jury charge that the Gold Certificate Contract is unequivocally a security would in effect be directing a verdict against him in violation of his Sixth Amendment rights. As we stated in *United States v. McClain,* 545 F.2d 988, 1003 (5th Cir.1977): "When the jury is not given an opportunity to decide a relevant factual question, it is not sufficient 'to urge that the record contains evidence that would support a finding of guilt even under a correct view of the law'", *quoting United States v. Casale Car Leasing, Inc.,* 385 F.2d 707, 712 (2d Cir.1967).

Johnson directs our attention to a criminal securities case where this Court required a jury's factual findings as to a security transaction in examining a criminal conviction. In *Roe v. United States,* 287 F.2d 435 (5th Cir.), *cert. denied,* 368 U.S. 824, 82 S.Ct. 43, 7 L.Ed.2d 28 (1961), this Court faced a complicated factual record revolving around the ultimate sale of investment interests in mineral leases. Roe and his associates had mailed promotional brochures offering great profits through investments in these lease interests. The profits did not exist, and Roe was charged

with several criminal violations of the Securities Act of 1933. Although acquitted on several of the charges, Roe was found guilty of violating 15 U.S.C. § 77e(a) (sale of unregistered securities).

Our examination on appeal lingered on the realization that the district court had instructed the jury that the evidence showed the existence of a sale of securities as a matter of law. We found no "real doubt that offerings of oil leases in this fashion may amount to an 'investment contract.'" 287 F.2d at 437. And we further found that the evidence of the lease sales could, as a matter of law, constitute the sale or delivery of an investment contract, hence a sale of a security as defined by the 1933 Act. But we held that a jury question existed regarding the representations of a common profit-making scheme that would turn the sale of property into the sale of a security. We held that under the particular facts before us it was impossible to determine the existence of a sale of a security without a factual determination of what actually had transpired. The case was therefore remanded to give a jury the opportunity to credit or discredit the evidence regarding the nature of the sales. We noted in *Roe:*

> [N]o fact, not even an undisputed fact, may be determined by the Judge. The plea of not guilty puts all in issue, even the most patent truths. In our federal system, the Trial Court may never instruct a verdict either in whole or in part. *United Brotherhood of Carpenters and Joiners of America v. United States,* 1947, 330 U.S. 395, 408, 67 S.Ct. 775 [782, 91 L.Ed. 973], *Christoffel v. United States,*

1949, 338 U.S. 84, 89, 69 S.Ct. 1447 [1450, 93 L.Ed. 1826]; *Brooks v. United States,* 5 Cir., 1957, 240 F.2d 905; *Hamilton v. United States,* 5 Cir., 1955, 221 F.2d 611, 615; *Schwachter v. United States,* 6 Cir., 1956, 237 F.2d 640, 644; *United States v. Gollin,* 3 Cir., 1947, 166 F.2d 123, 126, certiorari denied 333 U.S. 875, 68 S.Ct. 905 [92 L.Ed. 1151].

287 F.2d at 440 (footnote omitted). The jury, on retrial, found Roe guilty, and the conviction was affirmed, 316 F.2d 617 (5th Cir.1963).

The *Roe* case succinctly frames the issue in the matter before us: When does the definition of security, normally a question of law, become so intimately connected with the facts of a criminal case that a jury's resolution is necessary in order to comply with the Sixth Amendment? Johnson seeks shelter under the protective cover of *Roe.* Hence, we must determine whether that case's allowance for a jury determination of "security" status must be read broadly enough to encompass this case. For the reasons outlined below, we find that *Roe* does not dictate a jury submission on the status of the Gold Certificate Contract as a security.

A. Securities under section 2311—a question of law in criminal cases.

Established procedures in both this and other courts have permitted the determination as a matter of law that the documents at issue in criminal trials were securities within the meaning of the National Stolen Property Act, 18 U.S.C. §§ 2311, 2314,[3] the

---

3. Under 18 U.S.C. § 2314, part of the National Stolen Property Act, 18 U.S.C. §§ 2311–2318, it is illegal to transport a falsely made security knowingly in interstate commerce. The term "security" for purposes of § 2314 is defined in 18 U.S.C. § 2311. It states, in part:

> "Securities" includes any note, stock certificate, bond, debenture, check, draft, warrant, traveler's check, letter of credit, warehouse receipt, negotiable bill of lading, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share,

investment contract, voting-trust certificate; certificate of interest in property, tangible or intangible; instrument or document or writing evidencing ownership of goods, wares, and merchandise, or transferring or assigning any right, title, or interest in or to goods, wares, and merchandise; or, in general, any instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, warrant, or right to subscribe to or purchase any of the foregoing, or any forged, counterfeited, or spurious representation of any of the foregoing. . . .

statute under which appellant was convicted. The Supreme Court faced a case involving stolen checks in *United States v. Sheridan,* 329 U.S. 379, 67 S.Ct. 332, 91 L.Ed. 359 (1946). The Court did not question the trial court's rulings that the checks were securities within the meaning of the statute, or that the checks were forged. The only factual issue was found to be whether the defendant had *caused* the requisite interstate commerce. In *United States v. Elliott,* 571 F.2d 880, 907–08 (5th Cir.), *cert. denied,* 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978), this Circuit held that a Georgia state automobile title certificate is evidence of an interest in property as a matter of law. The case, brought under 18 U.S.C. § 2315 and the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968, looked to the section 2311 definition of security as including a document evidencing ownership of goods, and found that the title certificate fit within the statutory definition as a matter of law.

Similarly, in *United States v. Bass,* 562 F.2d 967, 969 (5th Cir.1977), we affirmed a holding that payroll drafts as a matter of law were securities within the reach of section 2314. We upheld the verdict of the district court, finding that the drafts were covered regardless of whether they were checks or sight drafts, since both were covered under the statute.

*Popeko v. United States,* 294 F.2d 168 (5th Cir.1961) examined whether cashier's checks were covered under section 2311. The defendant objected on appeal to the lack of a jury instruction defining the term "security." We found that no instruction was necessary because the district court correctly treated cashier's checks as securities as a matter of law under the statute.

The Eighth Circuit examined the scope of section 2311 in *United States v. Speidel,* 562 F.2d 1129 (8th Cir.1977), *cert. denied,* 435

U.S. 915, 98 S.Ct. 1468, 55 L.Ed.2d 505 (1978). The district court below had dismissed an indictment under section 2314 on the ground that quitclaim deeds, as a matter of law, were not securities under section 2311. The circuit court reversed, relying on legislative history, statutory construction, and other methods of legal interpretation to conclude that quitclaim deeds are covered under section 2311. The Sixth Circuit, in *United States v. Deaton,* 364 F.2d 820, 821 (6th Cir.1966), *cert. denied,* 386 U.S. 977, 87 S.Ct. 1173, 18 L.Ed.2d 138 (1967), found that checks were securities under section 2311 as a matter of law, citing *United States v. Sheridan, supra. Accord, United States v. Tucker,* 473 F.2d 1290 (6th Cir.), *cert. denied,* 412 U.S. 942, 93 S.Ct. 2785, 37 L.Ed.2d 402 (1973). Similar holdings have been made in the Second Circuit, *United States v. Wexler,* 621 F.2d 1218 (2d Cir.), *cert. denied,* 449 U.S. 841, 101 S.Ct. 119, 66 L.Ed.2d 48 (1980), (equipment leases), and the Tenth Circuit, *United States v. Roby,* 499 F.2d 151 (10th Cir.1974) (money orders); *United States v. Austin,* 462 F.2d 724 (10th Cir.), *cert. denied,* 409 U.S. 1048, 93 S.Ct. 518, 34 L.Ed.2d 501 (1972) (loan commitment letters).

Circuit courts have also examined section 2311 to conclude as a matter of law that other types of documents were *not* securities under that statute. In *United States v. Jones,* 450 F.2d 523 (5th Cir.1971), this Court found that as a matter of law an airline ticket was not a security under section 2311. The ticket did not represent an ownership interest in property because the airline was not legally obligated to exchange the ticket for cash; it merely was permitted to do so if it wished. Alternatively, we found that the ticket was not an "evidence of indebtedness" under the statutory definition of "security."[4] Similarly, in *Merrill v. United States,* 338 F.2d 763 (5th Cir.1964), *cert. denied,* 386 U.S. 994, 87 S.Ct. 1311, 18 L.Ed.2d 340 (1967), we found that a

---

As discussed later in this opinion, this § 2311 definition of "security" relevant to the § 2314 interstate transportation charge, is broader than that under the Securities Acts of 1933 and 1934.

4. *But c.f. United States v. Gallipoli,* 599 F.2d 100 (5th Cir.1979) (although airline ticket is not a security under § 2311, it is merchandise within the scope of 18 U.S.C. § 2315).

gasoline company credit card was not a security, an instrument used in making a security, or merchandise. Since the credit card lacked intrinsic value, we held as a matter of law that the card did not fit the definition in section 2311.

The Second Circuit found in *United States v. Canton,* 470 F.2d 861 (2d Cir.1972) that a New York state certificate of auto registration was not a security under section 2311 because the card did not evidence ownership, as do that state's current certificates of automobile title. The issue was decided, once again, as a matter of law. The Ninth Circuit held in a case brought under § 2314 and other statutes that department store scrip does not constitute a security. *United States v. Dunlap,* 573 F.2d 1092 (9th Cir.1978) (per curiam).

■ The critical conclusion from all of these summarized cases is that a court normally has the authority in criminal prosecutions to decide, *as a matter of law,* whether the Gold Certificate Contract is a "security" within the meaning of the National Stolen Property Act. The statute defines what a "security" is, and the courts properly apply that definition as a matter of law.

#### B. Securities under other statutes.

We have shown that courts normally have the power to decide "security" status under 18 U.S.C. § 2311 as a matter of law. We do not recognize, however, a *per se* rule that the issue can never require a jury's factual determinations. The cases cited above are in general persuasive but do not compel such a binding rule for all cases. We therefore look to other, similar statutory schemes for additional guidance.[5] The most obvious source of guidance is the voluminous jurisprudence interpreting the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, and the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78kk (Securities Acts).

The majority of the Securities Acts cases are civil rather than criminal in nature, but this does not necessarily limit the usefulness of considering their role as precedents. Violations of the Securities Acts are subject to both civil and criminal enforcement. *Compare, e.g.,* 15 U.S.C. §§ 77k, 77l [1933 Act] *and* § 78r [1934 Act] (civil penalties) *with* 15 U.S.C. § 77x [1933 Act] *and* § 78ff [1934 Act] (criminal penalties). So even the civil cases under the Securities Acts are useful analogies in the case before us. Appellant's contention would mean that a pure matter of law in a civil prosecution under the Securities Acts would become a question of fact in a criminal case under that same provision of the statute. Such a conclusion would be doubtful, especially considering that there is a constitutional right to jury trial in civil cases as well.

Beginning with *Securities and Exchange Comm'n v. C.M. Joiner Leasing Corp.,* 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943), holding that fractional interests in mineral leases are securities as a matter of law, and *Securities and Exchange Comm'n v. W.J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), holding that interests in orange groves are securities, there has been a steady line of cases under the Securities Acts upholding a finding of a "security" as a matter of law. The *Howey* case was a suit for an injunction against the sale of orange grove interests that failed to comply with the registration requirements of the Securities Acts. Justice Frankfurter's dissent in *Howey, id.* at 301–02, 66 S.Ct. at 1104–05, calling for the Court to uphold the district court's determination as a reasonable factual finding rather than freely reversible as a legal issue, underscores the fact that the majority's determination had been made as a question of law.[6]

---

5. As discussed later in this opinion, the paucity of case law on this subject might be explained in part by a failure of defense attorneys to request a jury instruction on this point. It makes little difference, for example, whether a judge or a jury determines whether publicly-traded stock is a security—reasonable minds would not differ on this point.

6. The issue of whether the determination was one of law or of fact was properly before the Court, because the original question in the district court was whether the shares were securities and that court had made the determination as a matter of law. 60 F.Supp. 440 (S.D.Fla. 1945).

A similar determination was made in *United States v. Fishbein,* 446 F.2d 1201 (9th Cir.1971), *cert. denied,* 404 U.S. 1019, 92 S.Ct. 683, 30 L.Ed.2d 667 (1972), a case involving diversion of corporate funds through stock transactions. The case was brought under the Stolen Property Act and the Securities Acts. The court relied on the definition of security under the 1933 Act, 15 U.S.C. § 77b, to find that stock is a security as a matter of law.

> It is urged that the Court erred in instructing the jury that the stock was a security. Stock is by law a security (15 U.S.C. [ ] § 77b). In some cases there may be a question of fact whether a thing sold is a security (*SEC v. C.M. Joiner Leasing Corporation,* 320 U.S. 344, 64 S.Ct. 120 [88 L.Ed. 88], (1943); *Roe v. United States,* 287 F.2d 435 (5th Cir. 1961)), but there was no fact question here.

446 F.2d at 1207. The Tenth Circuit has found reversible error in giving the jury the final determination of "security" in a civil case. *Ahrens v. American-Canadian Beaver Co.,* 428 F.2d 926, 928 (10th Cir.1970).[7]

Many cases under Rule 10b–5, 15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b–5, have also decided the question of "security" status as a matter of law. In the often discussed case of *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975), the Court examined shares in a government-sponsored nonprofit housing cooperative. The Court found that the "shares" of "stock" in the enterprise had few of the attributes of conventional corporate stock and held that the shares were not securities for the purposes of the 1933 and 1934 Acts. By affirming the district court's order to dismiss, the Court precluded any jury consideration of "security" status.

More recently, several courts have found that the sale of 100% of the stock of a closely-held company is not a sale of stock as a matter of law. In *Chandler v. Kew, Inc.,* 691 F.2d 443 (10th Cir.1977), Chandler had purchased all the stock of an incorporated liquor store owned and operated by the defendants. He later filed a suit under the antifraud provisions of the Securities Acts. The Tenth Circuit upheld the lower court's motion to dismiss for lack of subject matter jurisdiction, finding that there was no offer or sale of securities in the traditional sense. The sale was in actuality a sale of the business and not of the securities, so that the uncontroverted transfer of stock was not a securities transaction within the purview of the federal securities laws.

In *Frederiksen v. Poloway,* 637 F.2d 1147 (7th Cir.), *cert. denied,* 451 U.S. 1017, 101 S.Ct. 3006, 69 L.Ed.2d 389 (1981), the court faced a complex transaction that, when boiled down to its essentials was a 100% sale of a business with an accompanying management contract. The court found that the transaction, while nominally involving documents called "stock", did not involve a purchaser "placing money in the hands of another who will control the funds and the business decisions." *Id.* at 1148. Therefore, the sale did not involve a "security" within the meaning of the federal securities laws. The decision was made as a question of law.[8]

Johnson raises appealing, if flawed, arguments to distinguish these cases. First, Johnson argues that cases interpreting the 1933 and 1934 Acts are inapposite because the sweep of those acts is different than the coverage of the Stolen Property Act. True, it is different. But the Stolen Property Act is broader, not narrower. The definition of

---

**7.** This Circuit, however, has at least once upheld a district court's grant of this power to a jury. *Nor-Tex Agencies, Inc. v. Jones,* 482 F.2d 1093 (5th Cir.1973) *cert. denied,* 415 U.S. 977, 94 S.Ct. 1563, 39 L.Ed.2d 873 (1974), (whether document was an "investment contract" under the Securities Acts given to jury).

**8.** This so-called "Sale of Business Doctrine," a retreat from ever-expanding coverage of the securities laws, has been echoed in other courts. *See* Seldin, *When Stock Is Not a Security: The "Sale of Business Doctrine" under the Federal Securities Laws,* 37 Bus.Law. 637 (1982). In each of these cases, the determination of whether a security was present has been decided as a matter of law.

"security" under 18 U.S.C. § 2311 includes more items that either the 1933 or 1934 Securities Acts. For example, the Securities Acts do not cover "certificates of interest in property, tangible or intangible." *See United States v. Speidel*, 562 F.2d 1129, 1131 (8th Cir.1977), *cert. denied*, 435 U.S. 915, 98 S.Ct. 1468, 55 L.Ed.2d 505 (1978); *United States v. Austin*, 462 F.2d 724 (10th Cir.), *cert. denied*, 409 U.S. 1048, 93 S.Ct. 505, 34 L.Ed.2d 501 (1972) (loan commitment letter covered under § 2311). Congress clearly intended the term "security" to cover more under section 2311 than the same term covers under the Securities Acts. *See United States v. Canton*, 470 F.2d 861, 863–64 (2d Cir.1972) (discussing legislative history). So the broader scope of "security" under the Act before us gives greater leeway in interpreting the Gold Certificate Contract to be a security.[9]

Other federal statutes dealing with securities also establish a legal, rather than a factual, definition of "security." In *A.G.*

9. The broader scope of "security" under the *Stolen Property Act* means that some instruments may be securities under section 2311 even if they fail to pass the traditional *Howey* test of security status: an investment in a common enterprise with an expectation of profits due solely to the efforts of others. *See Securities and Exchange Comm'n v. W.J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946).

The Securities Acts, unlike the Stolen Property Act, include in the definition of what is a "security" the caveat "unless the context otherwise requires." 15 U.S.C. §§ 77b, 78c(a). Some cases and commentators have suggested that this phrase of exception gives a court an express statutory authorization, or even a duty, to consider as a matter of law when the statute "otherwise requires." *See, e.g., Frederiksen v. Poloway*, 637 F.2d 1147 (7th Cir.) *cert. denied*, 451 U.S. 1017, 101 S.Ct. 3006, 69 L.Ed.2d 389 (1981); *Seldin, supra* note 8, at 646–47. This phrase is not included under the Stolen Property Act, which could make it somewhat easier in Securities Acts cases to find the defining of "security" a matter of law. Yet the cases still stand for the overall proposition that "security" status is usually decided as a matter of law.

10. In some of the cases interpreting the meaning of "security" under various statutes, it is difficult to ascertain whether the parties ever called into question the court's authority to make a legal judgment as to "security." For example, in *United States v. Bass, supra*, the defendant claimed on appeal that the original

*Becker, Inc. v. Board of Governors of Federal Reserve System*, 693 F.2d 136 (D.C.Cir. 1982), the court decided as a matter of law that commercial paper is not a security for the purpose of 12 U.S.C. § 378(a)(1), part of the Glass-Steagall Act, found in scattered sections of title 12, U.S.C. The Glass-Steagall Act prevents national banks from entering the securities business. The court examined the legislative history of the statute and the nature of modern commercial paper, and concluded that commercial paper fell outside the statutory definition.[10]

## C. Questions of law under other criminal statutes.

This same problem of distinguishing legal from factual matters occurs in criminal statutes other than in the securities context. These other situations involving criminal prosecution bolster the conclusion that not every issue in a criminal case has to be submitted to the jury. In *United*

indictment was faulty by misdescribing the stolen securities as checks rather than drafts. Our Court found the claim to be frivolous, since we noted that either would be securities as a matter of law. However, we also held that the question was not properly before us, since neither party contested the district court's charge to the jury that the documents were securities as a matter of law. This demonstrates that an appellate court's acceptance of a lower's court's defining "security" as a matter of law sometimes is due to the failure of counsel to *preserve or raise the issue on appeal*, rather than an express holding that such a determination is proper.

Even some cases that reach the issue do so in dictum, rather than in an express holding. In *Popeko v. United States*, 294 F.2d 168 (5th Cir.1961) *cert. denied*, 374 U.S. 835, 83 S.Ct. 1883, 10 L.Ed.2d 1056, 375 U.S. 872, 84 S.Ct. 32, 11 L.Ed.2d 102 (1963), the ruling of "security" from the bench was not challenged in the district court. On appeal, this court first rejected a challenge to the finding of "security" due to this failure to preserve the error, but then went on to reach the merits as an alternative holding to find that the determination was one of law and not one of fact. The decision in *United States v. Roby*, 499 F.2d 151 (10th Cir. 1974) employed the same strategy. Yet as we have shown above the case law that reaches a review of the scope of "security" clearly points to the issue being decided as a matter of law.

*States v. Pietri,* 683 F.2d 877 (5th Cir.1982), we upheld a conviction for carrying a weapon during the commission of a felony. We did not require a jury determination of whether a .38 caliber Smith & Wesson revolver is a weapon. Although that case does not show explicitly that such a determination was requested, we had no problem finding a .38 caliber revolver to be a weapon as a matter of law.

The true factual issue in firearms cases is not whether the gun in question is a weapon, but rather whether the accused intentionally and willfully possessed the illegal weapon. In *United States v. Hernandez,* 662 F.2d 289 (5th Cir.1981) (per curiam), we affirmed a conviction of shipping firearms in interstate commerce. We upheld the finding as a matter of law that the weapons in question were firearms within the meaning of the statute. However, two convictions under other counts in the indictment were reversed because those counts required an intentional and willful shipping of prohibited firearms in interstate commerce. Since no jury instruction was given in the district court regarding the effect of the defendant's claimed ignorance of the law, we found that the jury had no standard by which to judge the requisite intent and willfulness. Had *Hernandez* believed, for example, that he was shipping water pistols rather than sawed-off shotguns, the jury could have acquitted on the counts requiring specific intent. We therefore remand the case for a proper jury determination of knowledge and intent. Similarly, in *United States v. Davis,* 583 F.2d 190 (5th Cir.1978), this Court examined a conviction for conspiring to export sawed-off shotguns. We did not demand a jury determination of whether the shotgun barrels were indeed less than eighteen inches long and therefore covered under the statute. But we did require a jury determination regarding the defendants' knowledge and intent.

The Dyer Act, 18 U.S.C. § 2312, prohibits the interstate transportation of stolen motor vehicles. In *United States v. Graves,* 669 F.2d 964 (5th Cir.1982), this Court did not require a jury determination of whether stolen trucks were stolen motor vehicles within the meaning of the Act. We required only a jury determination as to knowledge and intent; we found sufficient evidence for the jury's verdict of guilty. *See also United States v. Beil,* 577 F.2d 1313 (5th Cir.1978), *cert. denied,* 440 U.S. 946, 99 S.Ct. 1422, 59 L.Ed.2d 634 (1979) (Dyer Act) (auto theft) (jury not asked to consider what is a car). Although the inclusion of a car or truck within the Dyer Act's description of "motor vehicle" might seem too frivolous to present to a jury, that has not been our rationale in considering such issues as a matter of law. A more borderline issue, such as whether an amusement park bumper car or even a riding lawnmower is a "motor vehicle" under the Dyer Act, would also properly be a question of law and not of fact. *See also Frigaliment Importing Co. v. B.N.S. Int'l Sales Corp.,* 190 F.Supp. 116, 117 (S.D.N.Y.1960) (civil case) ("The issue is, what is chicken?"). That the determination may be difficult is insufficient to permit a judge to pass a legal question to a jury.

Other criminal statutes raise the "fact or law" inquiry. The Hobbs Act, 18 U.S.C. § 1951, prohibits threats or violence that affect interstate commerce. Although a jury is given the power to authenticate the factual testimony in a Hobbs Act case, "[a]ll of the Hobbs Act cases agree that the court should determine whether the facts alleged meet the statutory requirement of affecting interstate commerce." *United States v. Hyde,* 448 F.2d 815, 839 (5th Cir.1971), *cert. denied,* 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745 (1972). *See id.* at 839–42 and cases cited. Under the wire fraud acts, the question of whether a microwave transmission was a radio signal was made by the court and not the jury in *United States v. Bohr,* 581 F.2d 1294 (8th Cir.), *cert. denied,* 439 U.S. 958, 99 S.Ct. 361, 58 L.Ed.2d 351 (1978). Under 18 U.S.C. § 641, the Ninth Circuit affirmed a jury instruction that declared that the goods allegedly stolen were government property as a matter of law. *United States v. Jackson,* 436 F.2d 39 (9th Cir.1970), *cert. denied,* 403 U.S. 906, 91 S.Ct. 2209, 29 L.Ed.2d 682 (1971). And under 18

U.S.C. § 549, the court in *United States v. O'Brien*, 255 F.Supp. 755 (E.D.Mich.1965) instructed the jury that the place from which goods were allegedly stolen was a bonded warehouse as a matter of law. The Sixth Circuit affirmed, *United States v. Parisi*, 365 F.2d 601 (6th Cir.1966), *vacated on other grounds sub nom. O'Brien v. United States*, 386 U.S. 345, 87 S.Ct. 1158, 18 L.Ed.2d 94 (1967).

We here have only sampled the broad range of questions that are not submitted to the jury but are decided by the court as a matter of law.

### D. Intent as the issue.

From all these cases, we must conclude that there is little doubt that the issue of whether a particular document is a security is usually an issue of law. Yet this holding does not settle the legal dispute before us. The choice of "question of law" or "question of fact" is merely a smokescreen for the underlying issue of what elements of the case shall be presented to the jury. Even if the element of "security" status can be decided from the bench, the element of "intent" still remains. The issue which has to be submitted to the jury in a case such as ours is whether the accused acted with knowledge and intent—in other words, did Johnson *think* the document was a security.

The element of intent is usually a subjective view of the state of mind of the accused—a view that belongs within the exclusive domain of the jury. *United States v. De La Barra*, 447 F.2d 193 (5th Cir.1971); *Anderson v. United States*, 406 F.2d 529 (8th Cir.1969); *Hansen v. United States*, 326 F.2d 152 (9th Cir.1963); *Karikas v. United States*, 296 F.2d 434 (D.C.Cir. 1961); *Harris v. United States*, 285 F.2d 85 (5th Cir.1960), *cert. denied*, 368 U.S. 820, 82 S.Ct. 38, 7 L.Ed.2d 26 (1961). A defendant, for example, may believe he was carrying a water pistol rather than a magnum, but that negates only the requisite intent, not the existence of a firearm. In the case before us, Johnson could have believed he was transporting a brokerage contract and not a security. Such a belief would have

been incorrect as a matter of law, but would have negated the requisite intent.

Admittedly, the question of whether Johnson knowingly and intentionally transported a falsely made security across state lines must be proven in every respect in order to sustain a conviction. Johnson has focused on the term "security" in urging that he has not had a sufficient jury determination of his guilt. But Johnson's focus is unpersuasive, for the jury did confer on the critical points of fact needed to sustain a conviction. The question that only a jury could decide was not whether the document was a security, but whether Johnson intended it to serve as a security when he brought it into interstate commerce. The jury, after having been charged that the document was a security, found that he transported it across state lines *knowingly and intentionally*. They found no mistaken belief that the Gold Certificate Contract was a brokerage contract or a piece of tomfoolery. The jury made a finding of guilty, and we find substantial evidence to support that jury determination.

Another way to appreciate the distinction between the issue of security as a factual question and the issue of security as a legal doctrine is to discriminate between a state of being and a state of action. In *United States v. Manuszak*, 234 F.2d 421 (3d Cir. 1956), the final determination of "stolen goods" under section 2314 was held to be a jury issue. Determining that the goods were stolen would have required an adoption of factual evidence that someone had *acted* to steal the goods. In *Roe, supra,* 287 F.2d at 328, this Circuit observed that whether the issue should be treated as factual or legal depended upon whether facts outside the document weighed on the question of security status. By contrast, the definition of "security" under section 2314 in the case before us requires no such adoption of factual evidence. The determination does not rest on a party's actions in creating, misrepresenting, or forging the documents. It rests only on what the document is, a state of *being*. It is the nature of the document itself which is at issue, not

what may or may not have happened to it. Since the determination of "security" in the case before us, unlike *Manuszak* or *Roe*, does not require any judgment as to any act or acts that might have taken place, we find ourselves free to rule on the meaning of the contract without a jury determination.[11]

■ Johnson's last stand in the "fact" versus "law" debate is to reiterate that the difficulty in understanding the meaning of the document, and the conflicting testimony of expert witnesses as to its exact nature, turned the interpretation of the document into a jury question. We cannot agree. Expert witnesses might have disagreed in earlier times over whether orange grove interests were securities, *see Howey, supra,* whether "stock" in a housing co-op was a security, *see Forman, supra,* or whether noncontributory, compulsory pension plan interests were securities, *see International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America v. Daniel,* 439 U.S. 551, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979). Yet the difficulty in interpretation does not generate a factual issue—the dilemma is purely one of law.

## WAS THE LEGAL FINDING OF "SECURITY" CORRECT?

Having determined that the power to interpret the document rested properly with the district court judge, we must next consider whether the court erred in its ruling. We conclude there was no error.

■ First, we reiterate that the definition of "security" under the Stolen Property Act is broader than under the Securities Acts. *United States v. Speidel,* 562 F.2d 1129 (8th Cir.1977), *cert. denied,* 435 U.S. 915, 98 S.Ct. 1468, 55 L.Ed.2d 505 (1978). "Each of the 'securities' specified in § 2311

consists of a single document which in itself is sufficient to establish a given right, relationship, or property interest." *Merrill v. United States,* 338 F.2d 763, 769 (5th Cir. 1964), *cert. denied,* 386 U.S. 994, 87 S.Ct. 1311, 18 L.Ed.2d 340 (1967). The countervailing notion that a criminal statute must be narrowly construed, *Prussian v. United States,* 282 U.S. 675, 51 S.Ct. 223, 75 L.Ed. 610 (1931); *Merrill, supra,* 338 F.2d at 770, does not prohibit a broad interpretation of "security." *United States v. Austin,* 462 F.2d 724 (10th Cir.), *cert. denied,* 409 U.S. 1048, 93 S.Ct. 545, 34 L.Ed.2d 501 (1972) (interpreting § 2311); *Llanos v. United States,* 206 F.2d 852, 854 (9th Cir.1953), *cert. denied,* 346 U.S. 923, 74 S.Ct. 310, 98 L.Ed. 417 (1954) (Securities Acts) (criminal proceeding); *United States v. Speidel, supra,* 562 F.2d at 1131 n. 4.

Second, we point out that the certificate was one that had intrinsic value. This is evidenced by the fact that Johnson agreed to pay Brinlee for the use of the document, and I.V. was prepared to pay Johnson for procuring the contract. Yet even if the document were worthless because of the absence of the underlying gold that the contract purported to represent, the Gold Certificate Contract would *still* be a security under the Act because section 2311 includes not only valuable securities but also "any forged, counterfeited, or spurious representation of any of the foregoing." The essential point is that the document purports to be valuable. Forged stock from the New York Stock Exchange is a security under 18 U.S.C. § 2311 just as the genuine article would be. Similarly, restrictions on transferability do not negate "security" status—registered name stock is covered under the statute just as bearer form certificates are. Therefore, Johnson's protestations

---

**11.** As the Ninth Circuit noted in a recent workers' compensation case:

Whether particular facts fit within the meaning of certain legal terms is a question of law. *Cf. Estates of Franklin v. Commissioner,* 544 F.2d 1045, 1047 n. 3 (9th Cir.1976) (characteristics of transaction are questions of fact, but whether such characteristics constitute 'sale for tax purposes' is a question of law);

K. Davis, *Administrative Law Treatise* § 30.-01 (3d ed. 1972) (circumstances of arrest are questions of fact, but whether such circumstances amount to 'probable cause' is a question of law). *Duncanson-Harrelson Co. v. Director, Office of Workers' Compensation Programs,* 686 F.2d 1336, 1341 (9th Cir.1982).

that the document was not a security because it had no value to a thief is not in accordance with the law.

The contract itself promised to deliver to International Vaults or William J. Johnson 17,000 troy ounces of gold in the end of January, 1982. It purported to be backed up by a bill of sale and a negotiable warehouse receipt. As such, it represented, albeit falsely, an ownership interest in property. In the alternative, it might represent a right to subscribe to or purchase the ownership rights in the gold. The record shows that witnesses had conflicting opinions as to the nature and meaning of the certificate. Johnson points to the vagueness of the document to propose that it is not a security as a matter of law. We find, however, that whatever the inartfully-drawn document tried to be or tried not to be, it meets the statutory requirements of a security. The "economic reality" of the transaction, *Tcherepnin v. Knight,* 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967), specifically Johnson's promise to pay Brinlee $75,-000 for the successful use of the document, makes this perfectly clear.

Although various experts testified at trial with conflicting views as to the exact meaning of the contract, each interpretation was clearly covered under the broad-reaching definitions in section 2311. Whether the ownership right is that of the warehouse receipt or of the gold itself, or perhaps merely representative of the right to buy the gold, need not be determined.[12] In addition, the fact that the document purports to be nontransferable does not make the document worthless and therefore not a security as defined under the Act; the nontransferability would effect only the relative worth of the document and not its "security" status.

■ We conclude that the unsettled nature of the certificate does not prevent us from sustaining the district court's finding that there was a security present as a matter of law. The conflicting expert opinions

as to the meaning of the document in normal streams of commerce might show reasonable doubt regarding Johnson's knowledge and intent in his actions. But the jury found that Johnson was not a well-meaning, innocent party to the overall scheme. With both the legal and the factual elements pointing toward Johnson's guilt, we affirm the conviction under Count One of the indictment—interstate transportation of a falsely made security.

## USE OF THE TELEPHONES

Johnson's next challenge is to the "wire signals" charge in Count Two of his indictment. He contends that, first, the calls in question were not part of the scheme to defraud, and second, he did not cause the wire signals to be made. We find these positions unpersuasive.

■ As to the first part of the challenge, we find ample evidence that interstate telephone calls were made from California to Texas to try to confirm the existence of the gold. It was proper for the jury to find that these calls were part of the overall scheme to defraud, since the apparent purpose of the entire transaction was to create a confirmable asset out of thin air. In reviewing the sufficiency of the evidence to support a conviction we view the evidence in the light most favorable to the government. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). The relevant standard is whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). We conclude that a rational jury could properly find that the telephone calls were a reasonably foreseeable part of the plans from the very inception of the fraud.

The second part of the challenge, that Johnson was not responsible for "causing" the calls to be made, requires a review of

---

**12.** Each of the expert interpretations of the document would be a "security" under 18 U.S.C. § 2311. A holding in the district court as to the exact nature of the document therefore was not necessary. *United States v. Bass,* 562 F.2d 967, 969 (5th Cir.1977).

the pertinent facts. When Johnson returned to California with the document, he represented that he held the long-awaited certificate that would satisfy the auditors. Company officials jubilantly called their in-house accountant the evening Johnson returned and explained that it was "imperative" that he contact the outside auditor. The auditor heard of the certificate that same evening and called a Dallas bank the next morning in an attempt to verify the assets underlying the document. He made these calls to a phone number found on a business card attached to the Gold Certificate Contract. Johnson himself had appended the business card to the document when he handed it over to company officials.

When Johnson attached the business card of the Dallas bank to the Gold Certificate Contract, he made it obvious that a phone call or letter would be a proper way to confirm the authenticity of the document. A jury reasonably could conclude that this action "caused" the telephone calls to be made. It is not necessary to find that Johnson placed the calls himself in order to find that he "caused them to be placed." *Pereira v. United States,* 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954), *aff'g,* 202 F.2d 830 (5th Cir.1953); *United States v. Snyder,* 505 F.2d 595 (5th Cir.1974), *cert. denied,* 420 U.S. 993, 95 S.Ct. 1433, 43 L.Ed.2d 676 (1975); *United States v. Houlihan,* 332 F.2d 8 (2d Cir.), *cert. denied,* 379 U.S. 828, 85 S.Ct. 56, 13 L.Ed.2d 37 (1964). The conviction does not require that the calls be placed to the victim of the fraud. *United States v. Wise,* 553 F.2d 1173 (8th Cir.1977). The scheme to defraud need not be successful to create a violation of the wire fraud statute. *United States v. Hammond,* 598 F.2d 1008 (5th Cir.1979). The critical point is that the statute requires only that the telephone calls be the "foreseeable results" of the accused's actions. *United States v. Snyder, supra,* 505 F.2d at 601. The jury's findings on this count meet the rationality test, and we do not disturb them.

## ADMISSIBILITY OF EVIDENCE
## OF OTHER ACTS

Finally, Johnson argues that he was unfairly prejudiced by the district court allowing the jury to hear evidence of the later "coal certificate" transaction. He claims that the coal and the gold transactions were completely separate and that his trial should not have included irrelevant, prejudicial evidence of other transactions.

A careful viewing of the facts, however, points to but one overall scheme—namely, the scheme to generate a verifiable $8 million asset. Although the details of the coal scheme might not have been admissible under Fed.R.Evid. 404(a) to show Johnson's general character or propensity to commit the charged crime, they were admissible under Rule 404(b) "for other purposes, such as [to show] proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed.R.Evid. 404(b). *United States v. Federbush,* 625 F.2d 246 (9th Cir. 1980); *United States v. Presler,* 610 F.2d 1206 (4th Cir.1979); *United States v. King,* 505 F.2d 602 (5th Cir.1974); *United States v. Frick,* 490 F.2d 666 (5th Cir.1973) *cert. denied,* 419 U.S. 831, 95 S.Ct. 55, 42 L.Ed.2d 57 (1974). The district court has wide discretion in ruling on the scope of admissible evidence, and we find no abuse of that broad discretion.

## CONCLUSION

We find the district court was correct in holding the certificate in question to be a security within the statutory meaning. We uphold the jury finding that the accused dealt with the security with intent and understanding of its nature. We find the use of telephones was caused by the scheme to defraud. We find that the evidence of a later attempt to create a similar asset was admissible to show motive and intent.

We AFFIRM the district court.

ALVIN B. RUBIN, Circuit Judge, dissenting:

"Put simply, the right to be tried by a jury of one's peers finally exacted from the

king would be meaningless if the king's judges could call the turn." *United States v. Spock,* 416 F.2d 165, 181 (1st Cir.1969) (footnote omitted). In this case the district judge called the turn by instructing the jury that the government had proved an essential and contested element of the crime beyond a reasonable doubt. Because I think that his refusal to submit that issue to the jury violated the defendant's sixth amendment guarantee of a trial by an impartial jury, I respectfully dissent.

My brothers reach what I consider the wrong result because they define the question improperly. They focus on the distinction between "questions of fact" and "questions of law," assuming that these are distinct and definitive categories and that every issue can be classified as one or the other. For them, whether a particular piece of paper is a security is a "question of law" and, therefore, the judge may decide it. In effect, the court holds that, despite dispute, the judge may direct a verdict on a "legal" issue.

My view of the case is different. The issue before us is neither the distinction between "fact" and "law" questions nor the correctness of characterizing a particular question as one or the other. It is the respective province of judge and jury in a criminal trial.

The judge's role in a criminal trial is to instruct the jury about the law and the jury's function is to render a verdict. While the jury must apply the judge's instructions to the evidence before it, the sixth amendment guarantee of trial by an impartial jury assures that the jury will not be relegated to deciding only questions that judges think to be factual. The jury in a criminal trial does not answer interrogatories and it does not "find" facts; it decides whether the defendant is guilty or not guilty.

My brothers fail to take into account the different functions of judge and jury. By focusing instead on the elusive distinction between "questions of fact" and "questions of law," they permit the trial judge to instruct the jury that the defendant committed an essential element of the crime charged.

In the first jury trial conducted in the United States Supreme Court, Chief Justice Jay, after stating that the facts were undisputed and giving the Court's unanimous opinion about the law, nevertheless reminded the jurors:

[O]n questions of fact, it is the province of the jury, on questions of law, it is the province of the court, to decide. But it must be observed, that by the same law, which recognizes this reasonable distribution of jurisdiction, you have, nevertheless, a right to take upon yourselves to judge of both, and to determine the law as well as the fact in controversy.

*Georgia v. Brailsford,* 3 U.S. (3 Dall.) 1, 4, 1 L.Ed. 483 (1794) (footnotes omitted; civil case).

In 1835, Justice Story, sitting on circuit, affirmed that principle, charging the jury that they "are no more judges of the law in a capital or other criminal case, upon the plea of not guilty, than they are in every civil case .... In each of these cases, their verdict, when general, is necessarily compounded of law and of fact; and includes both. In each they must necessarily determine the law, as well as the fact ...."

Justice Story continued: "It is the duty of the court to instruct the jury as to the law; and it is the duty of the jury to follow the law, as it is laid down by the court ... If the jury were at liberty to settle the law for themselves ... the law itself would be most uncertain ... [and] in case of error ... the court would not have any right to review the law as it had been settled by the jury." *United States v. Battiste,* 24 Fed. Cas. 1042, 1043 (C.C.D.Mass.1835) (No. 14,-545). But, as the quotation shows, the jury rendered the verdict, not the judge. Justice Story recognized that any jury verdict necessarily includes the application of instructions given by the court to the facts in the case.

As a contemporary author explains it: There is considerable misunderstanding in the minds of the general public regard-

ing provisions making a jury the judge of fact and not of law. This misunderstanding is attributable in large part to the inaccuracy of the general rule that juries decide *only* the facts. This is an inaccurate expression because it leaves the impression that juries are not judges of the law at any time or in any sense. Juries are always judges of the law in the sense that juries must pass on the manner and the extent in which the law expounded by the judge fits the facts brought out in the evidence. This process requires juries to perform the legal function of interpretation and application. In the absence of express authority, however, juries are not judges of the law in determining what principle of law is applicable to the evidence.

S. McCart, Trial by Jury 116–17 (1965) (emphasis in original).

Johnson's judge became Johnson's jury. He did not merely instruct the jury on the legal principles applicable to this case. He went further and told the jurors how those principles had to be applied to the facts. He directed a verdict on a crucial issue, whether the government had proved an essential element of the crime charged.

In *SEC v. C.M. Joiner Leasing Corp.,* 320 U.S. 344, 355, 64 S.Ct. 120, 125, 88 L.Ed. 88, 95 (1943), Justice Jackson stated for the Supreme Court: "It would be necessary in any case for any kind of relief to prove that documents being sold were securities under the Act. In some cases it might be done by proving the document itself, which on its face would be a note, a bond, or a share of stock. In others the proof must go outside the instrument .... Where the proof is offered ... in a criminal case, it would have to meet the ... requirement of satisfying the *jury* beyond a reasonable doubt." (emphasis added).

Without citing *Joiner Leasing* we applied its precept in *United States v. Roe,* 287 F.2d 435 (5th Cir.), *cert. denied,* 368 U.S. 824, 82 S.Ct. 43, 7 L.Ed.2d 29 (1961). That case, I say with respect for my brothers' unsuccessful effort to circumnavigate it, is indistinguishable from this one. The defendant in

*Roe* was charged with illegal sale and delivery of unregistered securities. *See* 15 U.S.C. § 77e(a)(1), (2) (1976). He first contended that, as a matter of law, the sale of an entire mineral lease in real property could never constitute the sale of a "security" under the Act. The court rejected this argument on the ground that mineral leases generally could be investment contracts, hence securities. 287 F.2d at 440. The defendant then argued that, even if mineral leases could be "securities," the particular oil leases involved in his case were not. We agreed with his contention that this question should have been submitted to the jury, stating:

By its very nature, it is the peculiar facts of the setting which turns [sic] the offer from a mere sale of property into a sale of a security. That means that the ... jury, must determine the issue. More than that, this being a criminal case ... no fact, not even an undisputed fact, may be determined by the Judge. The plea of not guilty puts all in issue, even the most patent truths. In our federal system, the Trial Court may never instruct a verdict either in whole or in part.

And yet, that is substantially what the Trial Judge did here on the crucial issue of whether these were investment contracts. He instructed them flatly and without equivocation that they were.

*Id.* at 440 (citations and footnotes omitted).

*Roe* controls this case. It binds us because it is the law of the circuit; our circuit should adhere to it because, as *Joiner Leasing* indicates, it is right.

My brothers make no effort to show that the Supreme Court's statement in *Joiner* is inapplicable. They avoid *Roe* on the ground that appellate courts have held that, as a matter of law, such documents as quitclaim deeds and equipment leases are securities. This misses the mark. Those cases simply follow *Roe*'s first precept, that the court must determine whether it is legally possible for a generic class of documents to fit within the statutory definition of a "se-

curity."[1] They do not hold that a *particular* document that is within a generic class *must be* a security or that the court may so instruct the jury.

The appellate decisions interpreting the jury's province do not, of course, speak with one voice, and my brethren correctly note the disharmony. Some decisions support my understanding. *See United States v. Heller,* 635 F.2d 848, 856–57 (Em.App.1980) (court could not instruct jury that comparability of outlet had been established as a matter of law); *United States v. Benedetto,* 558 F.2d 171, 176–77 (3d Cir.1977) (court could not instruct jury that loans were "loanshark loans" as a matter of law); *Greenfield v. United States,* 341 F.2d 411, 412–13 (D.C.Cir.1964) (per curiam) (court could not instruct jury that pop bottle was dangerous weapon as a matter of law); *DeCecco v. United States,* 338 F.2d 797, 798 (1st Cir.1964) (court could not instruct jury that defendant had failed to pay wagering tax as a matter of law). Others support the majority's position. *See United States v. Guy,* 456 F.2d 1157 (8th Cir.) (obligations of the United States as a matter of law), *cert. denied,* 409 U.S. 896, 93 S.Ct. 136, 34 L.Ed.2d 153 (1972); *United States v. Morris,* 451 F.2d 969, 972–73 (8th Cir.1971) ("in federal custody" as a matter of law); *United States v. Briddle,* 443 F.2d 443, 447 (8th Cir.) (property of the United States as a matter of law), *cert. denied,* 404 U.S. 942, 92 S.Ct. 291, 30 L.Ed.2d 256 (1971); *United States v. Jackson,* 436 F.2d 39, 41–42 (9th Cir.1970) (government property as a matter of law), *cert. denied,* 403 U.S. 906, 91 S.Ct. 2209, 29 L.Ed.2d 682 (1971); *United States v. Parisi,* 365 F.2d 601 (6th Cir.1966) (bonded warehouse as a matter of law), *vacated*

on other grounds sub nom. *O'Brien v. United States,* 386 U.S. 345, 87 S.Ct. 1158, 18 L.Ed.2d 94 (1967); *Guy v. United States,* 336 F.2d 595, 597 (4th Cir.1964) (per curiam) (apparatus was a still as a matter of law). The other cases referred to by the majority, in which the defendant did not contest the court's taking an issue from the jury on the premise that the question was one of law, prove no more than that we do not note error in the absence of appeal and that appellate courts may indeed err when they pass lightly over an uncontested issue.

Discord in the precedents provides all the more reason to look to principle. In criminal cases, the court simply may not direct a verdict on any disputed issue. The inquiry is not "when does the definition of security, normally a question of law, become so intimately connected with the facts of a criminal case that a jury's resolution is necessary in order to comply with the Sixth Amendment?" Majority op., at 168. The real question is: when may the judge in a criminal case take a disputed issue from the jury and decide it himself? My answer is categorical: never.

Omitting only its decorative elements, the majority opinion reproduces the document in question, which was literally not worth the paper on which it was printed. Majority op., at 165–166 n. 2. The document purports to be a promise to deliver 17,000 troy ounces (1,416⅔ troy pounds) of gold for an unspecified price. Whether this piece of paper, which auditors refused to accept as having any ascertainable value, was a security was assuredly a more difficult and more controverted question than whether it was transmitted in interstate commerce when Johnson travelled by commercial air-

---

1. A security is:

[A]ny note, stock certificate, bond, debenture, check, draft, warrant, traveler's check, letter of credit, warehouse receipt, negotiable bill of lading, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate; certificate of interest in property, tangible or intangible; instrument or document or writing evidenc-

ing ownership of goods, wares, and merchandise, or transferring or assigning any right, title, or interest in or to goods, wares, and merchandise; or, in general, any instrument commonly known as a "security", or any certificate or interest or participation in, temporary or interim certificate for, receipt for, warrant, or right to subscribe to or purchase any of the foregoing, or any forged, counterfeited, or spurious representation of any of the foregoing.

18 U.S.C. § 2311 (1976).

plane from Dallas, Texas, to California with "the document in hand." Yet the uncontroverted interstate transportation issue was submitted to the jury, properly I contend, and my brethren apparently agree. The security issue, more elusive, disputed, and turning on the evidence adduced in court and not on definitions in a law book, the majority says not only *could* but, by necessary inference, *must* be taken from the jury and decided by the judge. If, indeed, it were appropriate to distinguish questions of law and of fact, the distinction would be: the definition of a security is a matter of law; whether this piece of paper with its elaborately embossed margin and its promise of 1416 pounds of gold is a security is a question of fact.

The jury's function is "the *independent* determination of the facts, *and* the *application of the law* ... to the facts ...." 2 C. Wright, Federal Practice and Procedure § 485, at 711 (2d ed. 1982) (emphasis added). Therefore, the jury charge should be a statement of the parties' claims, "the issues of fact that the jury must decide, *and the applicable law* ...." *Id.* (emphasis added).

. The trial judge in this case did not confine himself to instructing the jury about applicable legal principles. He usurped the jury's province on a critical issue and applied the law to the facts as he understood them. What the sovereign is barred from taking from the jury by autocratic command, its judges may not themselves arrogate.

I respectfully dissent.

## ON SUGGESTION FOR REHEARING EN BANC

Before CLARK, Chief Judge, BROWN, GEE, RUBIN, REAVLEY, POLITZ, RANDALL, TATE, JOHNSON, WILLIAMS, GARWOOD, JOLLY and HIGGINBOTHAM, Circuit Judges.

BY THE COURT:

A member of the Court in active service having requested a poll on the application for rehearing en banc and a majority of the judges in active service having voted in favor of granting a rehearing en banc,

IT IS ORDERED that the cause shall be reheard by the Court en banc with oral argument on a date hereafter to be fixed. The Clerk will specify a briefing schedule for the filing of supplemental briefs.